**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STORED VALUE SOLUTIONS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 09-495-JJF-LPS |
| | : | |
| | : | |
| CARD ACTIVATION TECHNOLOGIES, INC., | : | |
| | : | |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**
**REGARDING CLAIM CONSTRUCTION**

This case has been referred to me for purposes including providing recommended

constructions for disputed claim terms in the patent-in-suit in this declaratory judgment action. I

do so below.

**BACKGROUND**

**A.    Procedural History**

Plaintiff Stored Value Solutions, Inc. ("SVS") brought this action seeking a declaratory

judgment of invalidity of U.S. Patent No. 6,032,859 ("the '859 patent"), owned by Defendant

Card Activation Technologies, Inc. ("CAT").  (D.I. 1)  The matter was referred to me for claim

construction.  (D.I. 51)  Briefing was completed on January 27, 2010 (D.I. 46; D.I. 47) and I

conducted a Markman hearing on March 8, 2010 (D.I. 60).

**B.    The '859 Patent**

The '859 patent, entitled "Method for Processing Debit Purchase Transactions Using a

1

Counter-Top Terminal System," issued March 7, 2000 on an application filed September 15, 1997. It claims priority to two provisional applications, Nos. 60/025,281 and 60/033,153, which were filed September 18, 1996 and December 13, 1996, respectively. The '859 patent contains a total of thirty-eight claims, four of which are independent (claims 1, 10, 20, and 29).

Generally, the '859 patent relates to a method for processing three primary types of debit styled card transactions: 1) a purchase transaction, wherein a customer uses a debit styled card to purchase goods and/or services; 2) activation of a phone card; and 3) a prepaid debit card transaction wherein a customer purchases a debit card of a certain value that is debited every time a purchase is made with the prepaid card.

## C.   **Disputed Terms**

The parties present nine disputed claim terms for the Court's construction:

(1)    "***telecommunications means***" (claims 1, 10, 20, and 29);

(2)     "***debit styled card***" (claims 1, 10, 20, and 29);

(3)    "***debit purchase transactions***" (claims 1, 10, 20 and 29);

(4)    "***purchasing value of a card in response to card use***" (claims 1, 11, 20, and 30);

(5)    "***entering a customer authorization code for authorizing access to a customer data base of a host data processor***" (claims 1, 10, 21, and 32);

(6)    "***entering a clerk authorization code for initiating a debit purchase transaction***" (claims 1, 10, 21, and 32);

(7)    "***entering an authorization code through the keypad for having the computer initiate communication with a host data processor***" (claims 20 and 29);

(8)    "***requesting a response of approval or disapproval from the host data processor***"

2

(claims 1 and 20); and

(9)    "***credit authorization provider***" (claims 9, 19, 28, and 38).

All but two of the disputed claim terms (numbers 7 and 9 above) appear in independent

and exemplary claim 1, reproduced below (with disputed terms highlighted):

> A method for processing ***debit purchase transactions***, the method comprising the steps of:
>
> providing a counter-top terminal having ***telecommunications means*** operable with a computer, at least one keypad for data entry to the computer, a display responsive to the computer, and a card reader communicating with the computer for modifying ***purchasing value of a card in response to card use***;
>
> entering transaction data to the computer through keypad data entry;
>
> reading a ***debit styled card*** through the card reader for providing card data to the computer;
>
> ***entering a customer authorization code for authorizing access to a customer data base of a host data processor***;
>
> ***entering a clerk authorization code for initiating a debit purchase transaction***;
>
> electronically transmitting a transaction request to the host data processor through the ***telecommunications means*** of the counter-top terminal ***for requesting a response of approval or disapproval from the host data processor***;
>
> receiving a response from the host computer; and
>
> displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display.

('859 patent, col. 7 lines 46-67 to col. 8 lines 1-4)[1]

---

[1]    The '859 patent appears in the record at D.I. 44 Ex. 3.

## LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted).  Construing the claims of a patent is a question of law.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996).  "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324.  Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted).  "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).  The patent specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314.  Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would

5

otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

## CONSTRUCTION OF DISPUTED TERMS

**A.**     **"telecommunications means"**

The parties' first dispute centers on whether the term "telecommunications means" is in

means-plus-function format under 35 U.S.C. § 112 ¶6.  The term "telecommunications means" is

presumed to be in means-plus-function format.  *See Sage Prods. v. Devon Indus.*, 126 F.3d 1420,

1427 (Fed. Cir. 1997).  However, this presumption is overcome "[i]f in addition to the word

'means' and the functional language, the claim recites sufficient structure for performing the

described functions in their entirety."  *Trimed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed.

Cir. 2008).  I conclude that there is not sufficient structure in the claims at issue here to overcome

the presumption.

Claim 1 of the '859 patent claims, in pertinent part, a method for processing debit

purchase transactions, the method comprising the steps of:

> providing a counter-top terminal having ***telecommunications means*** operable with a computer . . .,
>
> …
>
> electronically transmitting a transaction request to the host data processor through the ***telecommunications means*** of the counter-top terminal for requesting a response of approval or disapproval from the host data processor, [and]
>
> receiving a response from the host computer . . . .

('859 patent, col. 7 lines 46-67 to col. 8 line 1 (emphasis added))

CAT contends that the term "telecommunications means" is not in means-plus-function

format.  According to CAT, the distance within the claim language between the first use of the

7

disputed term and the element that recites the function of the telecommunications means is inconsistent with means-plus-function claim drafting. (D.I. 60 at 104) However, CAT cites no authority for this proposition.

Relying on its expert and a technical dictionary, CAT next asserts that the word "telecommunications" itself imparts sufficient structure to a person having ordinary skill in the art and thereby overcomes the presumption by calling to mind the structure of a modem. (D.I. 44 at 12-13 Ex. 5 (Grimes Decl.) ¶¶ 11-12, 20, 22, 24-31, 34-35) CAT also points to a related case, *Card Activation Technologies, Inc. v. Walgreen Co.*, Case No. 06-C-5578 (N.D. Ill.), in which Magistrate Judge Valdez recommended that the Court construe the term "telecommunications means," as used in the '859 patent, as not being in a means-plus-function format. (D.I. 44 Ex. 6 at 10) Judge Valdez relied primarily on Mr. Grimes' unchallenged declarations that the term connoted a particular structure to one skilled in the art. (*See id.*) However, as both parties note, the related case settled before Judge Valdez's Report and Recommendation could be adopted and this Court is not required to agree with it. (D.I. 44 at 4; D.I. 47 at 13) Having reviewed all of CAT's extrinsic evidence, I have concluded that the presumption is not overcome.

Having determined that the term "telecommunications means" is in means-plus-function format, it becomes necessary to identify the corresponding function and structure. According to SVS, the function of the "telecommunications means" as used in claims 1 and 20 is "for requesting a response of approval or disapproval from the host data processor," and the function as the term is used in claims 10 and 29 is "for requesting authorization of the debit purchase transaction." (D.I. 43 at 8-9) CAT, on the other hand, proposes that the function of the "telecommunications means" as used in all four claims is "communicating with a host data

8

processor." (D.I. 44 at 13)  Claims 10 and 29 recite "communicating with a host data processor through the telecommunications means" ('859 patent, col. 8 lines 51-67 to col. 9 lines 1-7); claims 1 and 20 recite "transmitting a transaction request to the host data processor" and "receiving a response from the host computer" (*id.* col. 7 lines 46-67 to col. 8 lines 1-4).  CAT's construction – "communicating with a host data processor" – encompasses the "communicating," "transmitting," and "receiving" functions of the telecommunications means as recited in the claims.  SVS's construction, on the other hand, identifies not the function of the "telecommunications means," but the *purpose* of the communications conducted by the "telecommunications means."

Turning to the structure, SVS proposes "a modem that dials an electronic debit processor via a telephone line." (D.I. 43 at 9)  CAT contends the structure is instead "a modem or its equivalent." (D.I. 44 at 18)  While the parties generally agree that the structure includes a modem, SVS would limit the modem to one that communicates using a standard telephone line.  SVS finds support for its position in several passages of the specification that describe how the terminal "is connected via a modem line to a host computer" and "calls" and "dials" a host.  (D.I. 43 at 9-10)  The parties appear to be in agreement that at the time the patent was drafted, modems operated almost exclusively on standard "dial-up" phone lines.  (D.I. 43 at 11; D.I. 44 at 17)[2]  However, Federal Circuit "case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough." *Innogenetics N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371-72 (Fed. Cir. 2008).  Here, the claim term

---

[2]      Counsel for SVS emphasized this point by playing for the Court a recording of the now "old-fashioned" set of tones that were once associated with a "dial-up" modem establishing a connection to, for example, the internet, over a standard phone line.  (D.I. 60 at 14)

"telecommunications means" is sufficiently broad to encompass modern equivalents of modems that formerly relied on standard telephone lines. Nothing in the record suggests that the patentee disclaimed those equivalents.

Thus, I recommend that the Court construe "telecommunications means" as used in the independent claims of the '859 patent as a means-plus-function element, with the function being "communicating with a host data processor" and the associated structure being "a modem or its equivalent."

**B.      "debit styled card"**

SVS proposes that the term "debit styled card," as used in each of the four independent claims of the '859 patent, means "a card having a value in an associated account or a value stored on the card itself." (D.I. 43 at 11) CAT, by contrast, construes the term to mean "a prepaid card having an intrinsic value." (D.I. 44 at 19) The parties' competing constructions reflect their disagreement as to whether the term "debit styled card" includes ATM cards.[3] I agree with SVS that a "debit styled card" includes ATM cards and, therefore, recommend that the Court adopt SVS's proposed construction.

In CAT's view, the '859 patent discloses three distinct inventions: 1) an apparatus; 2) a method for activation of debit cards, cellular phones, and cellular accounts; and 3) a method relating to prepaid debit systems. (D.I. 60 at 26-27) CAT asserts that while the apparatus disclosed may be capable of processing purchase transactions using ATM cards, the method of processing of such cards is not claimed by the patent. (D.I. 46 at 8; D.I. 60 at 29) This is because while the patent was initially filed with apparatus claims, the applicant withdrew those

_____

[3]      The parties agree that the term does not include credit cards. (D.I. 47 at 8; D.I. 46 at 8)

10

claims during prosecution, and the patent subsequently issued with only method claims. (D.I. 43 Ex. C (Sept. 15, 1997 Preliminary Amendment))  Nothing in the record indicates that the specification was ever amended to reflect that the apparatus claims were withdrawn. (D.I. 60 at 32)

Relying on its expert, CAT contends that while the '859 patent generally discloses three types of point-of-sale transactions utilizing a card – termed "pay before" (e.g., a prepaid gift card), "pay now" (ATM card), and "pay later" (credit card) – the patent only claims transactions utilizing pay before (i.e., prepaid) cards. (D.I. 44 at 19-20 Ex. 5 (Grimes Decl.) ¶ 44)  CAT submits that references to ATM cards in the patent refer to either the subject matter of the abandoned apparatus claims[4] or the different payment forms that may be used to purchase a prepaid card. (D.I. 60 at 33; D.I. 44 at 20-21)

According to SVS, CAT's construction improperly excludes the preferred embodiment relating to ATM cards. (D.I. 47 at 2; D.I. 60 at 53)  The portion of the specification that SVS contends details the ATM card embodiment reads:

> By way of example, and as illustrated with reference to
> FIG. 2, ATM/Debit transactions 100 are performed in a manner
> that is familiar to the customer using their ATM or debit card. The
> customer selects a product, takes it to the sales counter for
> checkout, then as illustrated with reference to FIG. 2 provides
> input, by way of example, by swiping 101 the ATM/Debit card
> through the card reader 20 of the terminal unit 12 described earlier
> with reference to FIG. 1.

---

[4]     The abandoned apparatus claims included original dependent claim 10, which generally claimed a counter top terminal system useful in processing debit purchase transactions, the system comprising, among other things, "a phone card, a debit card, and an ATM card." (D.I. 43 Ex. C (Sept. 15, 1997 Preliminary Amendment) at SVS000175-176)

11

('859 patent, col. 3 lines 25-33) CAT's response – that this portion of the specification is limited to the abandoned apparatus claims – is unpersuasive. The "Detailed Description of the Preferred Embodiments" section is divided into two subparts: "The System" and "In Operation." ('859 patent, col. 2 line 53 & col. 3 line 24) The description of the system (i.e., apparatus) for processing debit purchase transactions immediately follows the subheader "The System," whereas the preferred embodiments of the different methods of processing debit purchase transactions, including the quoted language above, follow the subheader "In Operation." Hence, the quoted language is not limited to a description of the apparatus; rather, it also relates to the issued method claims.

CAT also argues that processing ATM cards is shown not to be part of the claimed invention because the specification describes the system as "capable of performing ATM transactions" ('859 patent, col. 2 lines 2-3), instead of saying processing ATM cards is "another feature of the system" or "yet another application," the language with which the "Summary of Invention" describes activation of prepaid debit cards (*id.* col. 2 lines 3-6). (D.I. 60 at 26, 29) However, the specification does not use these terms uniformly in the manner CAT's argument requires. Sometimes a "capability" (e.g., the "capability of receiving cash back from the store") is described as "[a]n additional feature" of the invention. ('859 patent, col. 3 lines 47-48) Other times part of the invention (e.g., the "Summary of the Invention's" introduction of the phone card embodiment) is described as merely being "useful." ('859 patent, col. 1 lines 64-66) Thus, the applicants did not use the words "feature" and "application" solely to introduce preferred embodiments of the invention; moreover, their use of word "capability" does not exclude ATM cards from the claimed embodiments.

12

Moreover, the independent claims of the '859 patent are facially broad enough to encompass the processing of ATM cards and there is nothing in the prosecution history from which one could find that the applicants disclaimed the processing of ATM cards when they disclaimed the apparatus. (D.I. 60 at 92-93, 99)

Furthermore, the problem the inventor was trying to solve supports that a debit styled card includes an ATM card. The "Background of the Invention" indicates that the inventor was trying to develop an inexpensive way of providing purchasing options to customers without the need for high capital investment by retailers, to allow smaller retail stores to capture the business of the 224 million ATM cardholders in the United States. ('859 patent, col. 1 lines 20 to 51) The specification goes on to detail the advantages to the merchant of point-of-sale debit transactions, which include guaranteed payment and a flat low fee for ATM transactions. ('859 patent, col. 2 lines 13-18) These goals indicate that the inventor envisioned that the debit styled card essential to the processing of debit purchase transactions includes ATM cards.

CAT faults SVS's construction for requiring the debit styled card to be associated with an account. (D.I. 44 at 21) However, the specification plainly envisions that the phone card and prepaid card embodiments are associated with an account. ('859 patent, col. 3 lines 53-60 ("For phone card transactions . . . [t]he present invention provides for a method whereby card stock in a store has no real value and only upon sale of the debit card 22 will an *account* be created and activated . . . .") (emphasis added); *id.* col. 5 lines 10-25 ("[F]or prepaid debit transactions . . . [t]he host keeps a record of the *account* balances . . . . Alternatively, in applications using smart cards (chip cards), the balance is kept on the card . . . .") (emphasis added)) Likewise, it is undisputed that an ATM card is associated with an account. (D.I. 44 at 21; D.I. 43 at 14)

13

Finally, CAT's expert, Mr. Grimes, somewhat undermines CAT's contention that debit

styled cards do not include ATM cards. In related litigation, CAT submitted a declaration by

Grimes that is best read as stating that "debit styled card," as that term is used in the '859 patent,

includes "ATM/debit cards." Grimes' 2008 declaration in the related case states, in pertinent

part:

> 44.        . . . The specification clearly limits the term
> "debit styled card" to debit cards, or cards having a
> value identified in a central database or stored on
> the card.
>
> 45.        The interpretation of the phrase "debit styled
> card" is consistent with the proper interpretation of
> the phrase "purchasing value of a card." A debit
> styled card is a card that maintains a purchasing
> value either in a central database or on the card
> itself and the value is debited at the time of the
> purchase.
>
> 46.        The examples given in the specification, as
> to which [CAT] agrees, are an ATM/debit card, a
> gift card and a phone card. The term "debit card"
> simply does not include credit cards.

(D.I. 47 Ex. H (Feb. 1, 2008 Grimes Decl.) ¶¶ 44-46) The subsequent declaration Grimes filed in

the instant action in 2010 (D.I. 44 Ex. 5 (Jan. 20, 2010 Grimes Decl.) ¶ 44), which contends that

ATM/debit cards are excluded from "debit styled cards," is inconsistent with his prior

declaration.[5]

---

[5]        I recognize that in his 2008 declaration, Grimes was primarily opining that "debit styled
card" did not include credit cards, a point not in dispute in the present action. Nonetheless,
Grimes did also state in his 2008 declaration that examples of debit styled cards in the '859
patent's specification include ATM/debit cards. I do not agree with CAT's attorney's contention
that in this portion of the 2008 declaration Grimes was stating only that ATM cards are a subset
of "debit card," and not also a subset of "debit styled cards." (D.I. 60 at 76, 80)

14

Accordingly, I recommend that the Court construe the term "debit styled card" in the manner proposed by SVS, which is "a card having a value in an associated account or a value stored on the card itself."

## C.     "debit purchase transaction"

The parties' dispute with respect to the proper construction "debit purchase transaction" is identical to their dispute over "debit styled card." Essentially, the parties again dispute whether this term includes ATM card transactions. SVS proposes that "debit purchase transaction" means "a transaction made using a debit styled card," with "debit styled card" having the meaning SVS has proposed, which includes ATM cards. (D.I. 47 at 9) CAT proposes that "debit purchase transaction" instead be construed as "a purchase transaction using funds that have been, or are being, assigned to the intrinsic value of a card/account." (D.I. 44 at 10)

For the reasons discussed in connection with the dispute over the "debit styled card" term, I agree that a "debit purchase transaction" includes a purchase transaction made using an ATM card. Accordingly, I recommend that the term "debit purchase transaction" be construed to mean "a purchase transaction made using a debit styled card," with debit styled card construed as I have previously recommended.[6]

## D.     "purchasing value of a card in response to card use"

SVS proposes that the term "purchasing value of a card in response to card use" be construed to mean "a value in an account associated with a card or a value stored on a card itself." (D.I. 43 at 15) CAT takes issue only with SVS's use of the word "account." (D.I. 46 at

---

[6]      The parties agree that "debit purchase transaction" does not include a credit card transaction. (D.I. 60 at 95, 98)

8) CAT instead construes the disputed term to mean "a value in a central data base identified by the card (for magnetic stripe cards) or stored on the card (for chip cards)." (D.I. 44 at 18)  I agree with SVS that the value of a card is in an account or stored on the card itself.

SVS argues for the "account" limitation here based on the same intrinsic evidence presented in support of the "account" limitation in the term "debit styled card." (D.I. 43 at 15) CAT concedes that use of the word "account" is not *per se* objectionable, but expresses concern that the word could be used to limit the scope of the patent claims through the implied requirement of a business arrangement between the card holder and the host data processor. (D.I. 44 at 19)  I agree with CAT that there is no such requirement.  Although the claims, viewed in light of the specification, are broad enough to encompass the situation where a card holder has a business arrangement with the host data processor, nothing in the '859 patent expressly or impliedly *requires* such an arrangement.

Thus, I recommend that the Court construe the term "purchasing value of a card in response to card use" to mean "a value stored on a card itself or a value in an account associated with a card (but not limited to situations where the card holder has a business arrangement with the host data processor)."

E.    **"entering a customer authorization code for authorizing access to a customer data base of a host data processor"**

SVS asks that the term "entering a customer authorization code for authorizing access to a customer data base of a host data processor" be construed to mean "the customer enters via the keypad a personal identification number for authorizing access to a customer data base of a host data processor." (D.I. 43 at 15)  CAT proposes instead "a series of numbers and/or letters, or a

16

combination thereof, on the card for authorizing access to a customer data base of a host data

processor." (D.I. 44 at 21-22) CAT contends that SVS's construction would improperly import

four limitations not found in the plain language of the claims, namely limitations that: 1) the

customer know the code, 2) the customer physically enter the code, 3) the customer enter the

code through the keypad, and 4) the code be a PIN (i.e., personal identification number). (D.I. 44

at 22) SVS responds by challenging CAT's insistence that the code is found "on the card" as this

would exclude a preferred embodiment. (D.I. 47 at 19) I conclude that both parties, to some

extent, are correct.

First, I find that the customer authorization code is not limited to a PIN. SVS argues that

the "customer authorization code" is a PIN based on the following disclosure:

> The customer selects a product, takes it to the sales counter
> for checkout, then as illustrated with reference to FIG. 2 provides
> input, by way of example, by swiping 101 the ATM/debit card
> through the card reader 20 of the terminal unit 12 described earlier
> with reference to FIG 1. The display 14 of the terminal unit 12 will
> prompt 102 the user to enter their PIN. The PIN is entered by the
> customer.

('859 patent, col. 3 lines 28-34) CAT responds that it would be improper to import the limitation

of a PIN into the claims on the basis of its usage in one embodiment when other embodiments do

not detail entry of a PIN. (D.I. 44 at 24) CAT is correct. The Federal Circuit has warned against

confining the claims to specific embodiments described in the specification. *See Phillips*, 415

F.3d at 1312-13. While the ATM card embodiment requires the customer to enter a PIN, the

phone card and prepaid card embodiments do not.

I turn next to how the customer authorization code is entered. In contrast to SVS's

proposal that the customer enters the code via the keypad, CAT's proposal that the customer

17

authorization code is located "on the card" implies that any party, through a swipe of the debit

styled card, may enter the code.  CAT finds support for its construction in the specification's

"Gold Card Program," an example of a prepaid debit card embodiment.  (D.I. 46 at 9)  The patent

states:

> 6.       After the card purchase, customer goes to
> cash register to place order.  Clerk rings up order
> and customer presents his Gold Card for payment.
>
> 7.       Clerk swipes card through register terminal.
> Register terminal calls host.  Host checks the card
> value against the original card purchase amount.
> Host then deducts current purchase and sends back
> balance remaining which is printed out on customer
> receipt.

('859 patent, col. 6 lines 38-44)  In CAT's view, this passage indicates that the customer

authorization code is located on the card and is entered by the clerk who swipes the card through

the terminal.  (D.I. 60 at 157-58)  However, as SVS points out, requiring the customer

authorization code to be on the card would improperly exclude the ATM card preferred

embodiment.  (D.I. 47 at 19)

SVS instead proposes that a customer authorization code must be entered by a customer

through the keypad of the terminal unit, reasoning that since the claim language states the

purpose of the keypad is "for data entry," a customer would necessarily enter her authorization

code through it.  (D.I. 43 at 16)  This, SVS contends, is in keeping with portions of the

specification that describe "a keypad 18 for entry of Personal Identification Numbers (PIN)."

('859 patent, col. 2 lines 59-60 & Abstract)  However, the patent contemplates data other than

18

just the authorization codes being entered through the keypad. For example, claim 1 recites the step of "entering transaction data to the computer through the keypad data entry." ('859 patent, col. 7 lines 54-55)

SVS also argues that prosecution history estoppel limits entry of the customer authorization code to "via the keypad." (D.I. 47 at 22-26) I do not agree. The file history shows that original independent claims 30 and 40 recited the element "entering an authorization code through the keypad for having the computer initiate communication with a host data processor." (D.I. 43 Ex. E (Sept. 8, 1999 Amendment) at SVS000201-02) Original claims 30 and 40 were rejected as anticipated by the Gutman patent, which taught entry of an authorization code through a keypad for having the computer initiate communication with a host data processor. (D.I. 43 Ex. D (March 8, 1999 Office Action) at SVS000190) In the same office action, the examiner indicated that dependent claims 31 and 43, which depended from claims 30 and 40 and recited the steps of "entering a customer authorization code for authorizing access to a customer data base of a host data processor" and "entering a clerk authorization code for initiating a debit purchase transaction," would be allowable if rewritten in independent form to include all the limitations of the rejected base claims. (*Id.* at SVS000193) Instead, the applicants cancelled claims 31 and 43 and rewrote independent claims 30 and 40, substituting the steps of "entering a customer authorization code for authorizing access to a customer data base of a host data processor" and "entering a clerk authorization code for initiating a debit purchase transaction" for the rejected element "entering an authorization code through the keypad for having the computer initiate communication with a host data processor." (D.I. 43 Ex. E (Sept. 8, 1999 Amendment) at SVS000201-202)

This prosecution history does not support an estoppel argument. The examiner's indication of allowability regarding the customer and clerk codes elements shows that the examiner viewed the customer, clerk, and authorization codes as distinct elements with distinct functions. Neither the customer nor clerk code elements ever recited the "via the keypad" limitation. The applicants did not accept the examiner's invitation to rewrite the rejected dependent claims, and were thus not required to import the limitations of the rejected base claim into them. Instead, the applicants permissibly rewrote the rejected *independent claims* by deleting the anticipated subject matter in favor of subject matter identified by the examiner as allowable. *See Festo v. Shoketsu,* 344 F.3d 1359, 1382 n.2 (Fed. Cir. 2003) (concurring opinion) ("[I]t is customary to present broad and successively narrow claims, to rewrite or cancel claims, and to move elements between dependent and independent claims.").

Accordingly, the intrinsic evidence indicates that the customer authorization code is neither limited to being on the card nor to being entered via the keypad. I thus recommend that the Court construe the term "entering a customer authorization code for authorizing access to a customer data base of a host data processor" to mean "a series of numbers and/or letters, or a combination thereof, which may be entered via the keypad by the customer or may be on the card itself, for authorizing access to a customer data base of a host data processor."

F.      **"entering a clerk authorization code for initiating a debit purchase transaction"**

CAT construes the term "entering a clerk authorization code for initiating a debit purchase transaction" to mean "the clerk enters a series of numbers and/or letters, or a combination thereof, which permits the initiation of a debit purchase transaction." (D.I. 44 at 24) SVS agrees that the code "permits the initiation of a debit purchase transaction" but construes the

phrase "entering a clerk authorization code" to mean "the clerk enters via the keypad a code." (D.I. 47 at 27) Notably, CAT does not dispute that the clerk must enter the authorization code, and SVS does not dispute the format of the code. *See, e.g.*, D.I. 60 at 156 (CAT's attorney: "I think . . . logic would tell me that the clerk has to enter the codes."). Thus, the only disputed issue is whether the clerk must enter the code "via the keypad." I agree with CAT that the clerk does not have to enter the clerk authorization code via the keypad.

SVS repeats the same arguments for the "via a keypad" limitation that I already rejected in connection with the "entering a customer authorization code" term above. (D.I. 43 at 17-18) SVS also contends that the preferred embodiment relating to cell phone activation – which describes the clerk "entering an authorization 206 code on the remote keypad" – mandates adoption of its proposed construction. (D.I. 43 at 18) However, as already explained, claim terms are not necessarily limited to a single preferred embodiment. (D.I. 47 at 27) Also, in the prosecution history, the "clerk authorization code" element never contained the "keypad" limitation, nor were the applicants obliged to insert it into the amended claims.

Therefore, I recommend that the Court construe the term "entering a clerk authorization code for initiating a debit purchase transaction" to mean "the clerk enters a series of numbers and/or letters, or a combination thereof, which permits the initiation of a debit purchase transaction."

**G.**   **"entering an authorization code though the keypad for having the computer initiate communication with a host data processor"**[7]

SVS proposes that this disputed term be construed to mean: "the customer enters via the

keypad a personal identification number for authorizing access to a customer data base of a host

---

[7]     Claim 20, in which the disputed claim term appears, reads:

> A method for processing debit purchase transactions, the method comprising the steps of:
>
> providing a counter-top terminal having telecommunications means operable with a computer, at least one keypad for data entry to the computer, a display responsive to the computer, and a card reader communicating with the computer for modifying purchasing value of a card in response to card use;
>
> entering sales transaction data to the computer through keypad data entry by a clerk;
>
> entering confirmation of the sales transaction data by a customer;
>
> reading a debit styled card through the card reader for providing card data to the computer;
>
> ***entering an authorization code through the keypad for for having the computer initiate communication with a host data processor***;
>
> electronically transmitting a transaction request to the host data processor through the telecommunications means of the counter-top terminal for requesting a response of approval or disapproval from the host data processor;
>
> receiving a response from the host computer; and
>
> displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display.

('859 patent, col 9 lines 56-67 to col 10 lines 1-15 (emphasis added))

data processor or the clerk enters via the keypad a code which permits the initiation of a debit purchase transaction." (D.I. 43 at 19; D.I. 47 at 27)  CAT proposes instead "a series of numbers and/or letters, or a combination thereof, entered via the keypad to establish a communication link with a host data processor." (D.I. 44 at 29)  I recommend that the Court adopt CAT's construction.

SVS argues that the only types of "authorization codes" in the '859 patent are the "customer authorization code" and the "clerk authorization code," and, accordingly, this general "authorization code" term should be construed to incorporate SVS's proposed constructions for those two specific types of authorization codes. (D.I. 43 at 19)  SVS also points out that certain claims depending from independent claims 20 and 29 – the claims in which this general "authorization code" term appears – indicate that the step of entering an authorization code requires entering both a customer authorization code and a clerk authorization code. (*Id.* at 19-20)

CAT argues that SVS's construction of this general "authorization code" term in claims 20 and 29 wrongly incorporates the limitations SVS proposes for the "customer authorization code" and "clerk authorization code" terms from claims 1 and 10. (D.I. 44 at 29)  Specifically, CAT finds three flaws in SVS's construction: 1) it requires that only the customer or clerk enter the authorization code, 2) it requires that the code is a PIN, and 3) it renders the function of the "authorization code" synonymous with the functions of the "customer authorization code" and "clerk authorization code." (*Id.* at 29-32)  CAT also points out that SVS's construction would improperly read limitations from certain dependent claims into the independent claims from which they depend. (*Id.* at 32)  To CAT, the general "authorization code" and its function are

wholly distinct from and broader than either the "customer authorization code" or the "clerk authorization code" terms.

For reasons already given, I recommend that the "code" portion of the disputed term not be limited to a PIN but instead be construed to mean "a series of numbers and/or letters, or a combination thereof." Given the plain language of the claims at issue, the code must be entered "via the keypad." Finally, I agree with CAT that the general "authorization code" language of claims 20 and 29 is broader than the "customer authorization code" and "clerk authorization code" terms. The general "authorization code" language does not specify that any particular party must enter the "authorization code." Also, the function of this general "authorization code"– "for having the computer initiate communication with a host data processor"– is broader than the functions of the "customer authorization code" ("authorizing access to a customer data base of a host data processor") or the "clerk authorization code" ("initiating a debit purchase transaction").

The prosecution history is consistent with this analysis. The examiner initially rejected as anticipated the general "authorization code" term based on the Gutman patent (U.S. Pat. No. 5,221,838), but indicated that the related "customer authorization code" and "clerk authorization code" terms were allowable subject matter. (D.I. 43 Ex. D (March 8, 1999 Office Action) at SVS000190, SVS000193) This implies that the examiner viewed the "authorization code" term as broader than the other (allowable) terms. *See In re Skvorecz*, 580 F.3d 1262, 1266 (Fed. Cir. 2009).

Accordingly, I recommend that the Court construe the term "entering an authorization code through the keypad for having the computer initiate communication with a host data

24

processor" to mean "a series of numbers and/or letters, or a combination thereof, entered via the keypad to establish a communication link with a host data processor."

**H.**    "**requesting a response of approval or disapproval from the host data processor**"

CAT proposes that the term "requesting a response of approval or disapproval from the host data processor," as it appears in claims 1 and 20, be construed to mean "a request to verify that sufficient funds are available in the account/card for the proposed debit purchase transaction." (D.I. 44 at 27)  SVS contends that the term does not require construction because it is self-explanatory and, thus, should be governed by plain meaning. (D.I. 47 at 31-32)  I agree with SVS that the term is self-explanatory, but believe it will be helpful to the jury to state just what that plain meaning is.

CAT relies on dictionary definitions to construe the purportedly related term "requesting *authorization* of the debit purchase transaction from the host data processor," which appears in Claims 10 and 29, as meaning to "permit" a debit purchase transaction. (D.I. 44 at 27-28) (emphasis added)  CAT then relies on claim differentiation to argue that the disputed term – "requesting a response of *approval* or *disapproval* from the host data processor," which appears in claims 1 and 20 – must be interpreted as something other than "to permit." (D.I. 44 at 28) (emphasis added)  The other thing it must mean, CAT concludes, is "a request to verify that sufficient funds are available in the account/card for the proposed transaction." (*Id.*)

CAT's argument that "approve" really means "verify" is unpersuasive.  CAT provides no citations to the intrinsic record in support of its position.  The plain meaning of the disputed term is clear when read in the context of the claims.  Accordingly, I recommend the Court construe the term "requesting a response of approval or disapproval from the host data processor" according

25

to its plain meaning, which is "requesting that the host data processor approve or disapprove a debit purchase transaction."

## I.    "**credit authorization provider**"[8]

CAT proposes that the term "credit authorization provider" means "a service provider that maintains the intrinsic value of the debit styled card in a central database identified by the card." CAT contends this term requires construction because otherwise it might be misinterpreted by a jury to mean only a Visa/MasterCard credit card processor. (D.I. 44 at 33-34) SVS, on the other hand, proposes that the term "credit authorization provider" be accorded its plain meaning. (D.I. 47 at 32) I conclude that neither proposal is satisfactory.

Adopting CAT's construction would have the result of importing the constructions it proposes for other disputed claim terms into this term. For instance, the portion of CAT's proposed construction that reads "the intrinsic value of the debit styled card" incorporates CAT's proposed construction of the terms "debit styled card" and "debit purchase transaction," which I have recommended that the Court reject.

Although I reject CAT's proposed construction, I agree that the term "credit authorization provider" may be confusing to the jury. Accordingly, I recommend that the Court construe the term "credit authorization provider" according to its plain meaning, which is "a service provider that maintains the value associated with a debit styled card."

---

[8]    Claim 9, in which this disputed claim term appears, reads: "The method according to claim 1, wherein the host data processor includes one of *a credit authorization provider*, a phone card provider, and a telephone switch." ('859 patent, col. 8 lines 48-50) (emphasis added)

## RECOMMENDED CONSTRUCTIONS

For the reasons set forth above, I recommend that the Court construe the disputed claim terms as follows:

(1)     The term "telecommunications means," as used in claims 1, 10, 20, and 29, be construed as a means-plus-function element, with the function being "communicating with a host data processor" and the corresponding structure being "a modem or its equivalent."

(2)     The term "debit styled card," as used in claims 1, 10, 20, and 29, be construed to mean "a card having a value in an associated account or a value stored on the card itself."

(3)     The term "debit purchase transactions," as used in claims 1, 10, 20, and 29, be construed to mean "a purchase transaction made using a debit styled card, that is a purchase transaction made using a card having a value in an associated account or a value stored on the card itself."

(4)     The term "purchasing value of a card in response to card use," as used in claims 1, 11, 20, and 30, be construed to mean "a value stored on a card itself or a value in an account associated with a card (but not limited to situations where the card holder has a business arrangement with the host data processor)."

(5)     The term "entering a customer authorization code for authorizing access to a customer data base of a host data processor," as used in claims 1, 10, 21, and 32, be construed to mean "a series of numbers and/or letters, or a combination thereof, which may be entered via the keypad by the customer or may be on the card itself, for authorizing access to a customer data base of a host data processor."

27

(6)     The term "entering a clerk authorization code for initiating a debit purchase transaction," as used in claims 1, 10, 21, and 32, be construed to mean "the clerk enters a series of numbers and/or letters, or a combination thereof, which permits the initiation of a debit purchase transaction."

(7)     The term "entering an authorization code through the keypad for having the computer initiate communication with a host data processor," as used in claims 20 and 29, be construed to mean "a series of numbers and/or letters, or a combination thereof, entered via the keypad to establish a communication link with a host data processor."

(8)     The term "requesting a response of approval or disapproval from the host data processor," as used in claims 1 and 20, be construed to mean "requesting that the host data processor approve or disapprove a debit purchase transaction."

(9)     The term "credit authorization provider," as used in claims 9, 19, 28, and 38, be construed to mean "a service provider that maintains the value associated with a debit styled card."

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections **of no longer than ten (10) pages within fourteen (14) days after being served with a copy of this Report and Recommendation.** Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right t ode novo review in the district court. *See Henderson v. Carlson,* 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart,* 171 Fed. Appx. 924, 925 n.1 (3d Cir. 2006). **A party responding to objections may do so within fourteen (14) days after being served with a copy of objections; such response shall not**

28

**exceed ten (10) pages. No further briefing shall be permitted with respect to objections without leave of the Court.**

The parties are directed to the Court's Standing Order In Non-*Pro Se* Matters For Objections Filed Under Fed. R. Civ. P. 72(b), dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov/StandingOrdersMain.htm.

Dated: April 28, 2010
Wilmington, Delaware

Hon. Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE