# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

STORED VALUE SOLUTIONS, INC.,
("n/k/a") CERIDIAN STORED VALUE
SOLUTIONS, INC.

               Plaintiff,

     v.

CARD ACTIVATION TECHNOLOGIES, INC.,

               Defendant.

C.A. No. 09-495-KAJ

## MEMORANDUM OPINION

_____

Richard L. Horwitz, Esq. and David E. Moore, Esq., Potter Anderson & Corroon LLP, 1313 N. Market St., 6th Fl., Wilmington, Delaware 19801, Counsel for Plaintiff, Stored Value Solutions, Inc., n/k/a Ceridian Stored Value Solutions, Inc.
    Of Counsel: Alan M. Fisch, Esq., Jason F. Hoffman, Esq., Coke Morgan
               Stewart, Esq. and R. William Sigler, Kaye Scholer LLP,
               The McPherson Bldg., 901 Fifteenth Street., N.W.,
               Washington, DC 20005-2327

Jack B. Blumenfeld, Esq. and Julia Heaney, Esq., Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St., P.O. Box 1374, Wilmington, Delaware 19899, Counsel for Defendant Card Activation Technologies, Inc.
    Of Counsel: J. David Wharton, Esq., Michael J. Peterson, Esq. and
               Nora M. Kane, Esq., Stinson Morrison Hecker LLP,
               1299 Farnam St., Ste. 1500, Omaha, Nebraska 68102
               Keith H. Orum, Esq. and Mark D. Roth, Orum & Roth, LLC
               53 W. Jackson Blvd., Ste. 1616, Chicago, Illinois 60604

_____

July 1, 2011
Wilmington, Delaware

JORDAN, *Circuit Judge Sitting by Designation.*

## I.    Introduction

Plaintiff Stored Value Solutions, Inc., doing business now as, Ceridian Stored Value Solutions, Inc. ("SVS") seeks a declaratory judgment of invalidity of U.S. Patent No. 6,032,859 (the "'859 patent"), owned by Defendant Card Activation Technologies, Inc. ("CAT"). (Docket Index ["D.I."] 1.) Before me now are SVS's Motion for Summary Judgment of Invalidity Due to Anticipation and Obviousness (D.I. 102), SVS's Motion for Partial Summary Judgment of Invalidity of Claims 20, 22-31, and 33-38 Due to Lack of Written Description (D.I. 167), CAT's Motion for Summary Judgment of Validity (D.I. 109), and CAT's Motion to Exclude the Expert Testimony of Lori Breitzke (D.I. 107). Relevant to the disposition of those motions is the construction of the term "purchase transaction" as used in the '859 patent. (*See* D.I. 134.) For the reasons that follow, including my decision on the construction of that term, I will deny both of CAT's motions, grant SVS's motion on Invalidity Due to Anticipation and Obviousness in part, and grant SVS's Motion for Partial Summary Judgment of Invalidity of Claims 20, 22-31, and 33-38 Due to Lack of Written Description.

## II.    Background

### A.    *Procedural Background*

SVS filed a complaint seeking a declaratory judgment of invalidity of the '859 patent under 35 U.S.C. §§ 102 and 103 on July 8, 2009. (D.I. 1.) CAT filed its answer on August 13, 2009. (D.I. 9.) A report and recommendation on claim construction of

2

63   nine disputed terms in the '859 patent was issued on April 28, 2010, (D.I. 61) and

64   adopted on June 3, 2010, (D.I. 64) over CAT's objections (D.I. 62). On December 17,

65   2010, the parties filed their cross motions for summary judgment on validity of the '859

66   patent, and CAT filed its motion to exclude the testimony of SVS's expert, Ms. Breitzke.

67   (D.I. 102, 107, 109.) At my request (D.I. 134, 138), the parties have briefed the Court on

68   the meaning of "purchase transaction" as used in the '859 patent (D.I. 135, 136, 137, 139,

69   140, 141) and whether the '859 patent's written description is adequate under 35 U.S.C.

70   § 112, ¶ 1 (D.I. 143, 144, 145, 146, 148, 149, 168, 171, 172). Oral argument on those

71   issues was held on March 25, 2011. (D.I. 159.) On April 1, 2011, SVS filed an amended

72   complaint, with leave of Court, alleging that, in addition to being invalid under 35 U.S.C.

73   §§ 102 and 103, the '859 patent was also invalid for failing to meet the written

74   description requirement of 35 U.S.C. § 112, ¶ 1. (D.I. 152). Additional expert discovery

75   and briefing was completed on the adequacy of the written description of the '859 patent

76   (D.I. 154, 155, 156, 157, 160, 161). The parties are scheduled to try this case before a

77   jury beginning on July 25, 2011.

78        **B.    The '859 Patent**

79        The '859 patent discloses a method for processing electronic transactions which

80   involve an ATM card, prepaid debit card, or phone card. Entitled "Method for

81   Processing Debit Purchase Transactions Using a Counter-Top Terminal System," the

82   '859 patent issued March 7, 2000, on an application filed September 15, 1997, and

83   claimed priority to two provisional applications, Nos. 60/025,281 and 60/033,153, that

84   were filed September 18, 1996 and December 13, 1996, respectively. As originally

85 issued, the '859 patent contained thirty-eight claims, four of which were independent

86 (claims 1, 10, 20, and 29). Pursuant to an ex parte reexamination of the patent, CAT

87 canceled dependent claims 21 and 32 and added language from those claims to the

88 independent claims on which they rely, claims 20 and 29, respectively. Ex Parte

89 Reexamination Certificate No. US 6,032,859 C1, October 5, 2010, Reexamination

90 Request No. 90/009,459, April 30, 2009.[1]

## III. Applicable Law and Standard of Review

91

### A. *Claim Construction*

92

93 "[A] district court may engage in claim construction during various phases of

94 litigation, not just in a *Markman* order," especially as "its understanding of the

95 technology evolves." *Conoco, Inc. v. Energy & Envtl., L.C.*, 460 F.3d 1349, 1359 (Fed.

96 Cir. 2006) (internal quotations omitted) (addressing a District Court's sua sponte

97 construction of a term). Claim construction is a matter of law. *Cybor Corp. v. FAS*

98 *Technologies, Inc.*, 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (en banc). "[T]he words of

99 a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH*

100 *Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v.*

---

[1] Two additional ex parte reexaminations of the '859 patent by the United Stated Patent and Trademark Office ("PTO") are pending, one of which was granted in part on prior art identified by SVS's motion for summary judgment of invalidity. Reexamination Request No. 90/011,004 (granting reexam November 9, 2010 on all claims of the '859 patent except for dependent claims 4, 15, 23, and 34); Reexamination Request No. 90/011,146 (granting reexam February 11, 2011 of all claims of the '859 patent relying in part on prior art cited by SVS in its motion for summary judgment of invalidity (D.I. 102)). Those reexamination proceedings have been consolidated. (D.I. 165.) A non-final office action issued May 12, 2011, in which the PTO found every remaining claim of the '859 patent invalid as either anticipated or obvious. (D.I. 165.)

101   *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). That ordinary meaning "is the

102   meaning that the term would have to a person of ordinary skill in the art in question at the

103   time of the invention," after a reading of the entire patent. *Id.* at 1313.

104        To determine ordinary meaning, the court should review the same resources as

105   would the person of ordinary skill in the art. *Multiform Desiccants, Inc. v. Medzam, Ltd.*,

106   133 F.3d 1473, 1477 (Fed. Cir. 1998). Those include "the words of the claims

107   themselves, the remainder of the specification, the prosecution history, and extrinsic

108   evidence concerning relevant scientific principles, the meaning of technical terms, and

109   the state of the art." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381

110   F.3d 1111, 1116 (Fed. Cir. 2004).

111        Of those resources, the patent specification is "the single best guide to the meaning

112   of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).

113   Moreover, while "the claims themselves provide substantial guidance as to the meaning

114   of particular claim terms," "the context in which a term is used in [a] claim" and the

115   "[o]ther claims of the patent in question" are useful for understanding the ordinary

116   meaning of a term "[b]ecause claim terms are normally used consistently throughout the

117   patent." *Id.* at 1314.

118        The patent specification does not stand alone, however. A court "should also

119   consider the patent's prosecution history." *Markman v. Westview Instruments, Inc.*, 52

120   F.3d 967, 980 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "Like the

121   specification, the prosecution history provides evidence of how the [Patent and

122   Trademark Office] and the inventor understood the patent." *Phillips*, 415 F.3d at 1317

123    (citing *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed.Cir. 1992)). A court may

124    also rely on extrinsic evidence, which is "all evidence external to the patent and

125    prosecution history, including expert and inventor testimony, dictionaries, and learned

126    treatises." *Markman*, 52 F.3d at 980. In particular, "dictionaries, and especially technical

127    dictionaries, ... have been properly recognized as among the many tools that can assist the

128    court in determining the meaning of particular terminology." *Phillips*, 415 F.3d at 1318

129    (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)).

130         However, during claim construction, "[t]he sequence of steps used by the judge in

131    consulting various sources is not important; what matters is for the court to attach the

132    appropriate weight to be assigned to those sources in light of the statutes and policies that

133    inform patent law." *Id.* at 1324. For example, extrinsic evidence is "less significant than

134    the intrinsic record in determining the 'legally operative meaning of disputed claim

135    language,'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)

136    (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318

137    (Fed. Cir. 2004)), and extrinsic evidence "is unlikely to result in a reliable interpretation

138    of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*,

139    415 F.3d at 1318-19. Thus, "[t]he construction that stays true to the claim language and

140    most naturally aligns with the patent's description of the invention will be, in the end, the

141    correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243,

142    1250 (Fed. Cir. 1998). For that reason, a construction should not exclude an inventor's

143    product or a preferred embodiment. *See Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d

144    1351, 1358 (Fed. Cir. 2007) (noting that claim construction conclusion can be reinforced

145    by the fact that alternate constructions would exclude the "products that [a] patent[] w[as]

146    designed to cover"); *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550

147    (Fed.Cir.1996) ("[A] claim interpretation that would exclude the inventor's device is

148    rarely the correct interpretation.").

149        ***B.    Summary Judgment***

150        Pursuant to Federal Rule of Civil Procedure 56(a), a "court shall grant summary

151    judgment if the movant shows that there is no genuine dispute as to any material fact and

152    the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Both the

153    movant and non-movant must support their factual positions either by "citing to particular

154    parts of materials in the record, including depositions, documents, electronically stored

155    information, affidavits or declarations, stipulations (including those made for purposes of

156    the motion only), admissions, interrogatory answers, or other materials" or by "showing

157    that the materials cited [by another party] do not establish the absence or presence of a

158    genuine dispute, or that an adverse party cannot produce admissible evidence to support

159    the fact." FED. R. CIV. P. 56(c)(1). In determining whether the asserted evidence shows

160    that there is a genuine dispute of material fact, a court must review the evidence and draw

161    all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby,*

162    *Inc.*, 477 U.S. 242, 261 (1986); *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1337

163    (Fed. Cir. 2003). However, a court should not make credibility determinations or weigh

164    the evidence presented by the parties. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

165    U.S. 133, 150 (2000). Furthermore, when determining whether summary judgment is

166    appropriate, a court "must view the evidence presented through the prism of the

167  substantive evidentiary burden." *Anderson*, 477 U.S. at 254; *see also AK Steel Corp. v.*

168  *Sollac*, 344 F.3d 1234, 1238 (Fed. Cir. 2003).

169  To defeat a motion for summary judgment after a moving party has carried its

170  burden under Rule 56(c), the non-moving party must "do more than simply show that

171  there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,*

172  *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citation omitted); *see*

173  *also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (explaining that a

174  party opposing summary judgment "must present more than just bare assertions,

175  conclusory allegations or suspicions to show the existence of a genuine issue" (internal

176  quotation marks omitted)). Rather, the non-moving party "must set forth specific facts

177  showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586-87 (citing

178  former FED. R. CIV. P. 56(e), amended Dec. 1, 2010); *see* Advisory Committee's Notes to

179  2010 Amendments to FED. R. CIV. P. 56 (explaining that "[t]he standard for granting

180  summary judgment remains unchanged" after the Amendments to Rule 56 effective

181  December 1, 2010). "Where the record taken as a whole could not lead a rational trier of

182  fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475

183  U.S. at 587 (internal citation omitted).

184  ### C.  *Invalidity*

185  A patent is presumed valid. 35 U.S.C. § 282. The burden of establishing

186  invalidity rests on the party asserting such invalidity and can be met only by clear and

187  convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242 (2011)

188   ("We consider whether § 282 requires an invalidity defense to be proved by clear and

189   convincing evidence. We hold that it does.").

190        *1.*    *Written Description*

191       The written description requirement of 35 U.S.C. § 112, ¶ 1 provides that:

192          The specification shall contain a written description of the invention, and of
193          the manner and process of making and using it, in such full, clear, concise,
194          and exact terms as to enable any person skilled in the art to which it
195          pertains, or with which it is most nearly connected, to make and use the
196          same, and shall set forth the best mode contemplated by the inventor of
197          carrying out his invention.
198
199   Whether a patent meets the written description requirement of 35 U.S.C. § 112, ¶ 1 is a

200   question of fact which must be answered by clear and convincing evidence if a patent is

201   to be invalidated. *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1347

202   (Fed. Cir. 2011) (precedential); *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336,

203   1354-55 (Fed. Cir. 2010) (en banc). That question is amenable to determination at the

204   summary judgment stage and may be based "solely on the face of the patent

205   specification." *Centocor*, 636 F.3d at 1347; *Univ. of Rochester v. G.D. Searle & Co.*, 358

206   F.3d 916, 927 (Fed. Cir. 2004); *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1247-

207   48 (Fed. Cir. 2002) (reversing the district court's denial of JMOL because no reasonable

208   juror could have concluded that the asserted claim was supported by adequate written

209   description); *Turbocare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*,

210   264 F.3d 1111, 1119 (Fed. Cir. 2001) (affirming grant of summary judgment of invalidity

211   under 35 U.S.C. § 112, ¶ 1 because "[n]o reasonable juror could find that [the patentee's]

212    original disclosure was sufficiently detailed to enable one of skill in the art to recognize

213    that [the patentee] invented what is claimed").

214        Section 112, ¶ 1 "contains a written description requirement separate from

215    enablement." *Ariad*, 598 F.3d at 1351. "[T]he description must clearly allow persons of

216    ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Id.*

217    (internal quotation marks omitted). "[T]he test for sufficiency is whether the disclosure

218    … reasonably conveys to those skilled in the art that the inventor had possession of the

219    claimed subject matter as of the filing date." *Id.*; *see also Carnegie Mellon Univ. v.*

220    *Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) (quoting *Vas-Cath Inc. v.*

221    *Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991)) ("[T]he applicant must 'convey

222    with reasonable clarity to those skilled in the art that, as of the filing date sought, he or

223    she was in possession of the invention,' and demonstrate that by disclosure in the

224    specification of the patent."). Such "possession as shown in the disclosure" requires "an

225    objective inquiry into the four corners of the specification," *Ariad*, 598 F.3d at 1351,

226    which must "describ[e] the invention, with all its claimed limitations," *Lockwood v. Am.*

227    *Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (emphasis removed). Examples or

228    an actual reduction to practice are not necessary under the written description

229    requirement; "a constructive reduction to practice that in a definite way identifies the

230    claimed invention can satisfy the written description requirement." *Ariad*, 598 F.3d at

231    1352 (citing *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366-67 (Fed. Cir. 2006)).

232    Ultimately, "the specification must describe an invention understandable to [a person of

233    ordinary skill in the art] and show that the inventor actually invented the invention

234 claimed." *Id.* at 1351. "A 'mere wish or plan' for obtaining the claimed invention is not

235 adequate written description." *Centocor*, 636 F.3d at 1348 (quoting *Regents of the Univ.*

236 *of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997)). However, even though

237 the "description requirement does not demand ... that the specification recite the claimed

238 invention *in haec verba*, a description that merely renders the invention obvious does not

239 satisfy the requirement." *Ariad*, 598 F.3d at 1352 (citing *Lockwood*, 107 F.3d at 1571-

240 72). Therefore, "the analysis compares the claims with the invention disclosed in the

241 specification, and if the claimed invention does not appear in the specification ... the

242 claim ... fails regardless of whether one of skill in the art could make or use the claimed

243 invention." *Id.* at 1348.

244        2.   *Anticipation*

245      Pursuant to 35 U.S.C. §§ 102, a claimed invention is "anticipated," and is

246 therefore not novel if it "was known or used by others in this country, or patented or

247 described in a printed publication in this or a foreign country, before the invention thereof

248 by the applicant" or "was patented or described in a printed publication in this or a

249 foreign country or in public use or on sale in this country, more than one year prior to the

250 date of the application for patent in the United States." 35 U.S.C. §§ 102(a)-(b).

251 Anticipation is a question of fact but can be amenable to summary judgment. *See*

252 *Upsher-Smith Labs., Inc. v. PamLab, LLC*, 412 F.3d 1319, 1322 (Fed. Cir. 2005)

253 (affirming grant of summary judgment in part on anticipation). "A patent is invalid for

254 anticipation if a single prior art reference discloses each and every limitation of the

255 claimed invention," and "a prior art reference may anticipate without disclosing a feature

of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (internal citation omitted). However, a prior art reference does not anticipate through mere disclosure of each and every limitation of a claim; it must also disclose the limitations as arranged in the claim and enable the claimed invention which it is asserted to anticipate. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1345 (Fed. Cir. 2008) (internal citations omitted); *see also Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("[U]nless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102.").

    3.    *Obviousness*

A claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art. 35 U.S.C. § 103(a) (2006); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 13-14 (1966); *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358 (Fed. Cir. 2011). Whether the claimed subject matter would have been obvious at the time of invention to one of ordinary skill in the pertinent art is a question of law based on several underlying facts: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and

278   failure of others. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); *Graham*, 383

279   U.S. at 17-18. When "the content of the prior art, the scope of the patent claim, and the

280   level of ordinary skill in the art are not in material dispute, and the obviousness of the

281   claim is apparent in light of these factors," summary judgment on the issue of

282   obviousness is appropriate. *KSR*, 550 U.S. at 427.

283         That question of obviousness also is not subject to any "rigid rule" that requires an

284   express "discussion of obvious techniques or combinations" in the prior art. *KSR*, 550

285   U.S. at 419. Rather, other factors, such as "market demand," "any need or problem

286   known in the field of endeavor at the time of invention and addressed by the patent," "the

287   inferences and creative steps that a person of ordinary skill in the art would employ," and

288   "common sense" may evidence obvious "design trends ... that would occur in the

289   ordinary course without real innovation." *Id.* at 418-20. Moreover, "neither the

290   particular motivation nor the avowed purpose of the patentee controls. What matters is

291   the objective reach of the claim. If the claim extends to what is obvious, it is invalid

292   under § 103." *Id.* at 419. Simply put, "a patent's subject matter can be proved obvious

293   by noting that there existed at the time of invention a known problem for which there was

294   an obvious solution encompassed by the patent's claims." *Id.* at 420.

295         Before the Supreme Court's decision in *KSR*, [the Federal Circuit] required
296         that a patent challenger show that a person of ordinary skill in the art would
297         have had motivation to combine the prior art references and would have
298         had a reasonable expectation of success in doing so. ... *KSR*, however,
299         instructs courts to take a more "expansive and flexible approach" in
300         determining whether a patented invention was obvious at the time it was
301         made. In particular, the Court emphasized the role of "common sense":
302         "[r]igid preventative rules that deny factfinders recourse to common sense
303         ... are neither necessary under our case law nor consistent with it.

13

304   *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 (Fed. Cir. 2010).

305        However, "a patent composed of several elements is not proved obvious merely by

306   demonstrating that each of its elements was, independently, known in the prior art."

307   *KSR*, 550 U.S. at 418. "When determining whether a patent claiming a combination of

308   known elements would have been obvious, we 'must ask whether the improvement is

309   more than the predictable use of prior art elements according to their established

310   functions.'" *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010)

311   (quoting *KSR*, 550 U.S. at 417). "Answering this question usually entails considering the

312   'interrelated teachings of multiple patents; the effects of demands known to the design

313   community or present in the marketplace; and the background knowledge possessed by a

314   person having ordinary skill in the art, all in order to determine whether there was an

315   apparent reason to combine the known elements in the fashion claimed by the patent at

316   issue.'" *Id.* at 1341 (quoting *KSR*, 550 U.S. at 418). That factual inquiry, and "the legal

317   determination of obviousness[,] may include recourse to logic, judgment, and common

318   sense" and be "appropriate for resolution on summary judgment or JMOL." *Wyers v.*

319   *Master Lock Co.*, 616 F.3d 1231, 1239-40 (Fed. Cir. 2010); *Perfect Web Tech., Inc. v.*

320   *InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) ("We therefore hold that ... an

321   analysis of obviousness ... may include recourse to logic, judgment, and common sense

322   available to the person of ordinary skill that do not necessarily require explication in any

323   reference or expert opinion."); *Ball Aerosol & Specialty Container, Inc. v. Limited*

324   *Brands, Inc.*, 555 F.3d 984, 993 (Fed. Cir. 2009) (reversing district court and granting

325   summary judgment of obviousness).

326 **IV. Discussion**

327     Before moving to the merits of the motions before me, I first address the

328 construction of "purchase transaction" in the '859 patent.

329     *A.*     *"Purchase Transaction"*

330     CAT proposes that "purchase transaction" be construed as "the acquisition of

331 goods or services by the payment of money or its equivalent; to buy." (D.I. 135 at 2.)

332 SVS proposes that "purchase transaction" be construed as a "transaction that debits,

333 credits, or activates a debit-styled card." (D.I. 136 at 10.) For the following reasons, I

334 shall construe the term as "a transaction with the intended effect of decreasing the

335 purchasing value of, increasing the purchasing value of, or activating a debit styled card."

336     I begin with the patent specification. *Phillips*, 415 F.3d at 1315. A "method for

337 processing debit purchase transactions" is the method claimed by each and every claim of

338 the '859 patent. The independent claims, which are 1, 10, 20, and 29, all directly recite

339 "[a] method for processing debit purchase transactions." [2] ('859 patent at 7:46, 8:52,

---

[2] Claims 1, 10, 20, and 29 read in full as follows:

    1. A method for processing debit purchase transactions, the method comprising the steps of:
    providing a counter-top terminal having telecommunications means operable with a computer, at least one keypad or data entry to the computer, a display responsive to the computer, and a card reader communicating with the computer for modifying purchasing value of a card in response to card use;
    entering transaction data to the computer through keypad data entry;
    reading a debit styled card through the card reader for providing card data to the computer;
    entering a customer authorization code for authorizing access to a customer data base of a host data processor: [*sic*]

entering a clerk authorization code for initiating a debit purchase transaction;

electronically transmitting a transaction request to the host data processor through the telecommunications means of the counter-top terminal for requesting a response of approval or disapproval from the host data processor;

receiving a response from the host computer; and

displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display.

10. A method for processing debit purchase transactions, the method comprising the steps of:

providing a counter-top terminal having telecommunications means operable with a computer, a keypad for data entry to the computer, an alphanumeric display responsive to the computer, and a card reader communicating with the computer;

entering transaction data for a debit purchase transaction to the computer through keypad data entry;

reading a debit styled card through the card reader for transferring card data to the computer;

entering a customer authorization code for authorizing access to a customer data base of the host data processor;

entering a clerk authorization code for initiating a debit purchase transaction;

communicating with a host data processor through the telecommunications means of the counter-top terminal for requesting authorization of the debit purchase transaction;

requesting authorization of the debit purchase transaction from the host data processor; and

receiving the authorization.

20. A method for processing debit purchase transactions, the method comprising the steps of:

providing a counter-top terminal having telecommunications means operable with a computer, at least one keypad for data entry to the computer, a display responsive to the computer, and a card reader communicating with the computer for modifying purchasing value of a card in response to card use;

entering sales transaction data to the computer through keypad data entry by a clerk;

entering confirmation of the sales transaction data by a customer;

reading a debit styled card through the card reader for providing card data to the computer;

entering an authorization code through the keypad for having the computer initiate communication with a host data processor;

entering a customer authorization code for authorizing access to a customer data base of a host processor; and

entering a clerk authorization code for initiating a debit purchase transaction.

electronically transmitting a transaction request to the host data processor through the telecommunications means of the counter-top terminal for requesting a response of approval or disapproval from the host data processor;

receiving a response from the host computer; and

displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display.

29. A method for processing debit purchase transactions, the method comprising the steps of:

providing a counter-top terminal having telecommunications means operable with a computer, a keypad for data entry to the computer, an alphanumeric display responsive to the computer, and a card reader communicating with the computer;

entering sales transaction data by a clerk for a debit purchase transaction to the computer through keypad data entry;

entering confirmation of the sales transaction data by a customer;

reading a debit styled card through the card reader for transferring card data to the computer;

entering an authorization code through the keypad for having the computer initiate communication with a host data processor;

entering a customer authorization code for authorizing access to a customer data base of a host processor; and

entering a clerk authorization code for initiating a debit purchase transaction.

communicating with a host data processor through the telecommunications means of the counter-top terminal for requesting authorization of a debit purchase transaction;

requesting authorization of the debit purchase transaction from the host data processor; and

receiving the authorization.

('859 Patent at 7:46-8:44, 8:51-9:7, 9:56-10:15, 10:63-11:20; '859 Reexam Cert. 2:1-4, 2:31-4).

340    9:56, 10:63.)[3]  Every dependent claim recites such a method through direct reference,

341    (8:5; 8:9; 8:13; 8:27; 8:38; 8:41; 8:48; 9:8; 9:11; 9:15; 9:19; 9:23; 9:36; 9:45; 9:48; 9:53;

342    10:22; 10:25; 10:39; 10:50; 10:53; 10:58; 10:60; 11:21; 11:24; 11:36; 12:1; 12:16: 12:25:

343    12:28; 12:34), or indirect reference, (8:46).  Therefore, the definition of "purchase

344    transaction," indeed "debit purchase transaction," must be broad enough to encompass

345    the specific method recited in each and every claim.  *See* 37 C.F.R. § 1.75 ("Claims in

346    dependent form shall be construed to include all the limitations of the claim incorporated

347    by reference into the dependent claim."); *General Protecht Grp., Inc. v. Int'l Trade*

348    *Comm'n*, 619 F.3d 1303, 1307 n.2 (Fed. Cir. 2010) (noting that claims that depend from

349    another have "the same limitation[s]").

350            CAT asserts that such "purchase transactions" are only those in which goods or

351    services are acquired through the payment of money.  (D.I. 135 at 2.)  CAT is correct in

352    asserting that those types of transactions are covered by the claims.  Indeed, it is

353    abundantly clear from the specification that the claims, and the term "purchase

354    transaction," must be read broadly enough to encompass such transactions.  The written

355    description provides numerous examples of preferred methods in which goods are

356    purchased and a debit card value is "debited" or "deduct[ed]."  (3:26-43; 5:17-18; 6:43-

357    44; 7:22-28.)

358            However, "purchase transaction" cannot be construed so narrowly as to refer only

359    to the purchase of goods and services and the associated decrease in the value of a debit

---

[3] I cite to the patent as originally issued.  Where language was added to claims 20
and 29 on reexamination, I cite to the reexamination certificate.

360    card. The claims themselves never speak of "deducting" or "decreasing" the value of a

361    debit styled card.[4] Rather, the plain language of the claims indicates that a "purchase

362    transaction" occurs when the value of a debit card is modified, including when it is

363    increased. Independent claims 1 and 20 recite that the purpose of the counter-top

364    terminal is for "modifying purchasing value of a card." (7:52-53; 9:62-63.) Claims 11

365    and 30 are drawn to debit purchase transactions which "compris[e] the step of *modifying*

366    *a purchasing value of the card.*" (9:8; 11:21 (emphasis added).) And claims 5, 16, 24,

367    and 35[5] are drawn to debit purchase transactions which include the step of "*increasing*

---

[4] I adopt the convention of the patent (*see, e.g.*, 7:56) and write the term "debit styled" as a non-hyphenated compound adjective.

[5] Claims 5, 16, 24, and 35 read in full as follows:

     5. The method according to claim 1, wherein the transaction request transmitting step comprises the steps of:
        requesting a credit increase for use with the debit card;
        receiving a credit amount from customer;
        entering the credit amount into the computer using the keypad;
        transmitting credit amount data representative of the credit amount received to the host data processor;
        increasing the value of the debit card by the credit amount.

     16. The method according to claim 10, wherein the transaction request transmitting step comprises the steps of:
        entering a credit amount into the computer using the keypad;
        transmitting the credit amount received to the host data processor; and
        increasing the value of the debit card by the credit amount.

     24. The method according to claim 20, wherein the transaction request transmitting step comprises the steps of:
        requesting a credit increase for use with the debit card;
        receiving a credit amount from customer;
        entering the credit amount into the computer using the keypad;
        transmitting credit amount data representative of the credit amount received to the host data processor;

368 *the value of the debit card* by [a] credit amount." (8:36; 9:43; 10:48; 12:23 (emphasis

369 added).) Therefore, the definition of "purchase transaction" must include transactions in

370 which the purchasing value of a debit card is modified, including through an increase.

371    The written description of the '859 patent further reinforces that point. A

372 preferred embodiment of a claimed method is described as "a debit card having a certain

373 value" being *increased in value ...* once the balance is depleted or is insufficient for the

374 purchase." (5:14, 5:28-30 (emphasis added).) The written description also provides an

375 example of a method where *"value is to be added"* to a debit styled card (7:13) *before*

376 (7:12-20) a "purchase is to be made" with the card (7:19-20), as described by the steps

377 labeled 401, 404, 406, 408, and 410 in Figure 6 (7:11-17), in a complete transaction

378 separate from the "purchase" of any goods. Thus, the claims and written description

379 clearly indicate that a "purchase transaction" encompasses a transaction in which the

380 purchasing value of a debit-styled card is increased, a transaction which can occur

381 completely separate from the purchase of any goods.

382    In addition, the written description also includes other "purchase transaction"

383 methods which do not concern the purchase of goods, decreasing the purchasing value of

384 a debit styled card, or even increasing the purchasing value of a debit styled card. It

---

increasing the value of the debit card by the credit amount.

35. The method according to claim 29, wherein the transaction request
transmitting step comprises the steps of:
    entering a credit amount into the computer using the keypad;
    transmitting the credit amount received to the host data processor; and
    increasing the value of the debit card by the credit amount.

385  describes preferred embodiments of the claimed methods for "making an account active"

386  (4:16) for "Phone Debit cards" (3:56) and for the "purchase and activation of cellular

387  styled phones" (4:48-49) and "cellular activation" (4:59-60), as illustrated by Figure 4

388  (4:59). These examples, which appear to be drawn as preferred embodiments for claims

389  4, 15, 23, and/or 34, indicate that activating a debit purchase transaction is necessarily

390  part of what the patent specification refers to as a "purchase transaction" too.[6]

391  Therefore, "[b]ecause claim terms are normally used consistently throughout the

392  patent," *Phillips*, 415 F.3d at 1314, and the patent specification is "the single best guide

393  to the meaning of a disputed term," *Phillips*, 415 F.3d at 1315, the term "purchase

394  transaction" should be construed broadly enough to encompass methods for processing

395  transactions "with the intended effect of decreasing the purchasing value of, increasing

396  the purchasing value of, or activating a debit styled card."

397  I recognize that such a construction would, as CAT points out, expand the

398  ordinary meaning of "purchase," which is "to buy." (D.I. 135 at 2.) I am also aware of

399  the various parts of the '859 patent's written description which address the purchase of

---

[6] It cannot be the case that use of a debit card to purchase a phone card is what makes the preferred method concerning phone cards "purchase transactions," for the written description specifically states that cash or credit cards can be used to purchase those debit-styled cards. (3:64-66.) In other words, the debit purchase transaction regarding phone cards that is described in the written description is one in which a phone card is purchased by some means and activated. Thus, the definition of "purchase transaction" must encompass "activation," or else the activation of phone cards in the methods covered by claims 4, 15, 23, and 34 would not be the very "purchase transactions" the patent describes them to be in those claims, by reference to independent claims.

400   goods and services.[7] I am, however, very reluctant to construe "purchase transaction" in

401   a manner that would eliminate preferred embodiments for claims 4, 5, 15, 16, 23, 24, 34,

402   and 35. *See Osram*, 505 F.3d at 1358. Therefore, regardless of the ordinary meaning of

403   "purchase transaction," it is clear that the term must include transactions for decreasing as

404   well as increasing the purchasing value of a debit styled card, and transactions for

405   activating a debit styled card.

406       The extrinsic record evidence further supports such a construction. Namely,

407   CAT's own expert, Dr. Grimes, whom CAT has put forth as one of ordinary skill in the

408   art, described claim 5 as covering the return of a good to a store in a transaction which

409   occurs separately from a purchase and one which "increases the value in [an] account by

410   whatever the cost of the [good] was." (D.I. 137, Ex. E, Grimes Dep. at 107:2-3.) CAT

411   counters that Dr. Grimes stated that a return transaction is covered under claim 5 because

412   the return transaction "must occur in conjunction with a purchase transaction as set forth

413   in Claim 1." (D.I. 137, Ex. E, Grimes Dep. at 107 11-12.) So, according to CAT, a

414   return transaction is covered by claim 5 only after a "purchase transaction" occurs under

415   claim 1, i.e., "the dependent claim step of a credit transaction (increasing the value of the

416   card by return of product, void of purchase, or otherwise adding value to the card) is

---

[7] The written description includes the following passages: "allowing [merchants] to accept all credit and ATM cards for the purchase of goods or services" (Abstract); "ATM/Debit transactions are performed in a manner that is familiar to the customer using their ATM or debit card ... customer selects a product, takes it to the sales counter" (3:26-29); "ATM transaction card terminal for the purchase of goods and services" (1:56-57); and "Gold card will be good for purchase in the restaurant or for long distance calls" (6:36-37).

417 optional, which is consistent with the use and purpose of a dependent claim." (D.I. 139 at

418 4.)

419     That argument assumes that claim 5 has a requirement that the method in claim 1

420 be performed first. However, claim 5 describes an entirely new method that, while

421 dependent on claim 1, stands on its own. *See Karsten Mfg. Corp. v. Cleveland Golf Co.*,

422 242 F.3d 1376, 1384 (Fed. Cir. 2001) (acknowledging that dependent claims stand on

423 their own); *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve Inc.*, 796 F.2d 443, 446

424 (Fed. Cir. 1986) ("each claim shall be presumed valid independently of the validity of

425 other claims"). Moreover, claim 5 states that the transaction data transmitting step of

426 claim 1 is replaced, indicating that only a single transaction is ever processed. (8:27-28.)

427 Thus, it appears, without any meaningful qualification, that Dr. Grimes believes a return

428 transaction during which the account associated with a debit card is increased in value is

429 a method covered by claim 5. SVS's expert, Ms. Breitzke, agrees. "One of ordinary skill

430 in the art would recognize the 'debit purchase transaction' disclosed in the '859 patent as

431 including multiple types of transactions, including return transactions." (D.I. 104, Ex. B,

432 Breitzke Rebuttal Report at 6.) Therefore, since claim 5 covers a method for processing

433 debit purchase transactions, such transactions must include those in which the account

434 associated with a debit card is to be increased in value, such as a return transaction.

435     Despite the intrinsic and extrinsic evidence, CAT argues that the principle of claim

436 differentiation weighs heavily against a construction of the term "purchase transaction"

437 that includes transactions for increasing the purchasing value of a debit styled card or for

438 activating the card. CAT asserts that such a construction would make claims 4 and 5

23

439  superfluous because claim 1 would already include those transactions. That argument

440  misses the mark. First, claim 1 is written as an open-ended method claim. (7:47

441  ("method *comprising* the steps of:").) Claims 4 and 5 specify certain limitations in a new

442  method. Construing "purchase transaction" to include increasing the purchasing value of

443  a debit card or activating a debit card would not make claims 4 and 5 superfluous, but

444  would prevent them from being read narrowly on only transactions in which goods are

445  purchased, which the written description indicates should not be the case. (7:11-20

446  (describing a transaction in which "*value is to be added*" to a debit styled card (7:13)

447  *before*, (7:12-20) a "purchase is to be made" with the card (7:19-20), as described by the

448  steps labeled 401, 404, 406, 408, and 410 in Figure 6 (7:11-17), in a complete transaction

449  separate from the purchase of any goods (emphasis added).)

450      Second, the principle of claim differentiation stands for the proposition that

451  "different words or phrases used in separate claims are presumed to indicate that the

452  claims have a different meaning and scope." *Karlin Tech., Inc. v. Surgical Dynamics,*

453  *Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999). Here, we are reading the same term,

454  "purchase transaction" as applying in the same manner to two claims. If we were to read

455  the term as CAT suggests, we would narrow the scope of the term to a point where

456  preferred embodiments disclosed in the written description would no longer be covered

457  by any claim. Claim differentiation does not support CAT's argument.

458      Therefore, the intrinsic and extrinsic evidence counsel in favor of construing the

459  term "purchase transaction" as "a transaction with the intended effect of decreasing the

460  purchasing value of, increasing the purchasing value of, or activating a debit styled card."

461 Although somewhat different than the ordinary meaning of "purchase," that construction

462 is the most reasonable one that would preserve the scope of the claims in the '859 patent

463 and ensure that each preferred embodiment described in the patent is covered by a claim

464 of the patent.

465 **B.    *CAT's Motion to Exclude the Testimony of SVS's Expert***

466 I consider next CAT's motion to exclude the testimony of SVS's expert Lori

467 Breitzke, whom SVS seeks to have opine on the validity of the '859 patent.  For the

468 following reasons, I will deny CAT's motion and allow Ms. Breitzke's testimony.

469 The standard for admitting expert testimony is set forth in Rule 702:

470 If scientific, technical, or other specialized knowledge will assist the trier of
471 fact to understand the evidence or to determine a fact in issue, a witness
472 qualified as an expert by knowledge, skill, experience, training, or
473 education, may testify thereto in the form of an opinion or otherwise, if (1)
474 the testimony is based upon sufficient facts or data, (2) the testimony is the
475 product of reliable principles and methods, and (3) the witness has applied
476 the principles and methods reliably to the facts of the case.
477
478 FED. R. CIV. P. 702.
479
480 Before admitting such testimony, federal judges must exercise a gatekeeping role,

481 ensuring that any testimony heard by a jury satisfies the requirements of Rule 702.

482 *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592-93 (1993).  The Third Circuit

483 has explained that Rule 702 has three requirements: (1) the expert must be qualified, (2)

484 the methodology must be reliable, (3) and the proposed testimony must fit the facts of the

485  case.[8] *United States v. Schiff*, 602 F.3d 152, 172-73 (3d Cir. 2010). I address each of

486  those requirements below.

### 1. Qualification

488  Since 1987, Ms. Breitzke has worked in the field of payment systems and

489  point-of-sale devices. (D.I. 104, Ex. A., Breitzke Report at 1.) During that time, she has

490  helped design hardware and software products for processing point-of-sale transactions.

491  (*Id.*) Presently, she is Chairperson for the Electronic Transactions Association Education

492  Committee, which represents companies in the electronic transaction processing industry,

493  and she is the owner of E&S Consulting, LLC, which provides consulting services for

494  companies in the industry. (*Id.* at 1-2.) Based on that work history, Ms. Breitzke is

495  qualified "by knowledge, skill, experience, training, or education," FED. R. EVID. 702, to

496  opine on the '859 patent and the prior art and to help the jury make the necessary

497  comparisons between the two.

498  CAT does not challenge Ms. Breitzke's qualification as an expert with respect to

499  the electronic transaction industry or point-of-sale devices but, nonetheless, argues that

500  Ms. Breitzke is unqualified because she lacks knowledge of basic patent principles and of

---

[8] Because the admissibility of expert testimony is an evidentiary ruling not unique to patent law, I apply Third Circuit law. *See, e.g., Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999) (explaining that where "evidentiary rulings raise procedural issues not unique to patent law, this court applies the law of the regional circuit where appeals from the district court would normally lie"); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 n.2 (Fed. Cir. 1999) ("Rule 702's gatekeeper function, as discussed in *Kumho Tire*, relates solely to the admissibility of evidence."); *Medtronic Inc. v. Boston Scientific Corp.*, --- F. Supp. 2d ----, 2011 WL 1193381, *10 (D. Del. Mar. 30 2011) (applying Third Circuit law to determine the admissibility of expert testimony on patent infringement).

501     the legal requirements for anticipation, obviousness, and written description. Ms.

502     Breitzke is not being offered as an expert on patents, however. She is offered as an

503     expert on point-of-sale transactions and devices. Her role is not to educate the jury on the

504     requirements of patent law, but to help the jury understand the point-of-sale technology,

505     to understand how a person of skill in the art would view the specification, and to make a

506     factual comparison between the claimed invention and the prior art. I will then instruct

507     the jury on applying the law to the facts as the jury finds them. While it is necessary that

508     Ms. Breitzke's testimony be sufficiently tethered to the law so as to be relevant and

509     reliable – which will be addressed below – her lack of expertise in patent law does not

510     affect her qualification as an expert on the electronic transaction industry or on point-of-

511     sale technology. Consequently, I find Ms. Breitzke sufficiently qualified to render the

512     she has tendered.

513         *2.*    *Reliability*

514        In her reports, Ms. Breitzke sets forth the methodology she intends to use in

515     demonstrating that the '859 patent is anticipated, obvious, or lacks a written description

516     of the invention.[9] With respect to anticipation, she notes that "a claim is invalid when a

517     single prior art reference … existed prior to the claim's priority date and teaches every

518     element of the claim;" she sets forth an accurate description of the various forms prior art

519     can take; and she explains that her opinion will demonstrate "how every element of the

---

[9] I consider the reliability and fit of Ms. Breitzke's opinions as a whole and do not address whether, after my decision on summary judgment, there remains anything for Ms. Breitzke to opine on at trial.

'859 patent was known and described in a particular prior art reference." (D.I. 104, Ex.

A., Breitzke Report at 25.) Her report then employs the methodology as described,

identifying each element of every patent claim, comparing those elements to various prior

art references, and explaining how, in her opinion, each claimed element is present in a

particular prior art reference. (D.I. 104, Ex. A., Breitzke Report at 10, 35-57.) That

approach is consistent with the Federal Circuit's instruction that "a claim is anticipated if

each and every limitation is found either expressly or inherently in a single prior art

reference," *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir.

1998), and hers is, therefore, a reliable method for assisting the jury to decide the

question of anticipation.[10]

---

[10] CAT claims that Ms. Breitzke's testimony should be excluded because it fails to discuss the requirement for an anticipating prior art reference to disclose the patented elements "arranged or combined in the same way recited in the claims." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). While Ms. Breitzke's reports do not use the word "arrangement," I am satisfied that she opines not only that the prior art "disclose[s] all elements of the claim[s] … but … also disclose[s] those elements arranged as in the claim." *Id.* (internal quotation marks omitted). CAT also claims that Ms. Breitzke's testimony should be excluded for failing to discuss the enablement requirement. At least with respect to the MicroTrax manual, it is clearly enabled because it thoroughly describes a device that had been in public use already. Whether or not she has shown that other prior art references are enabled does not affect the admissibility of her testimony because the fact that her opinion might have covered other aspects of anticipation does not render her opinion unreliable with respect to what it does cover. The same is true of CAT's argument that Ms. Breitzke has failed to address reasonable probability of success on the question of obviousness. Likewise, if CAT's arguments are characterized as challenging the "fit" of Ms. Breitzke's testimony, the fact that her opinion might have covered other areas does not, in this case at least, render her opinion unhelpful with respect to what it does cover.

530         With respect to obviousness, Ms. Breitzke's report notes that "a patent cannot be

531 obtained if the differences between the subject matter to be patented and the prior art are

532 such that the subject matter as a whole would have been obvious at the time of the

533 invention to a person having ordinary skill in the art;" she correctly recognizes that "the

534 combined teachings of more than one prior art reference can be used to demonstrate that

535 all of the elements of a claim were known;" and she explains that her opinion will show

536 "how the combined teachings of two particular prior art references disclose each claim

537 element of the '859 patent … [and] why one of ordinary skill in the art would combine

538 the teachings of the particular references." (D.I. 104, Ex. A., Breitzke Report at 25-26.)

539 This approach reflects the statutory description of obviousness and is consistent with

540 Federal Circuit precedent. *See* 35 U.S.C. § 103; *Muniauction, Inc. v. Thomson Corp.*,

541 532 F.3d 1318, 1325-27 (Fed. Cir. 2008). It is, therefore, a reliable method for

542 establishing obviousness.

543         Finally, with respect to written description, Ms. Breitzke's report outlines her

544 understanding that "the specification must contain a written description of the invention";

545 that a proper analysis "compares the claims with the invention disclosed in the

546 specification … from the view of a person of ordinary skill in the art"; and that while "the

547 specification need not describe the claimed invention verbatim" it must do more than

548 "make it obvious to a person of ordinary skill in the art." (D.I. 169, E.x A., Breitzke

549 Report (April 2011) at 6.) Then, Ms. Breitzke identifies each limitation in the relevant

550    steps of the claims,[11] compares those limitations to the invention disclosed in the written

551    description, and explains why, in her opinion, a person of ordinary skill in the art would

552    or would not find in the written description the limitation as asserted in the claims. That

553    approach reflects the Federal Circuit's instruction that the specification must "describ[e]

554    the invention, with all its claimed limitations," *Lockwood*, 107 F.3d at 1572, and that "the

555    analysis compares the claims with the invention disclosed in the specification, and if the

556    claimed invention does not appear in the specification … the claim … fails regardless of

557    whether one of skill in the art could make or use the claimed invention." *Ariad*, 598 F.3d

558    at 1348. It is, therefore, a reliable method for analyzing the written description.

559           *3.    Fit*

560           An expert's opinion has the necessary "fit" for a case when it is "sufficiently tied

561    to the facts of the case that it will aid the jury in resolving a factual dispute." *Schiff*, 602

562    F.3d at 173 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).

563    Each part of Ms. Breitzke's opinion is dedicated either to describing the patent and the

564    prior art or to comparing the patented claims to the prior art and to the invention

565    disclosed in the specification. That is sufficiently tied to the facts to aid in resolving

566    whether the '859 patent is anticipated or rendered obvious by the prior art discussed in

---

[11] Ms. Breitzke limited her opinion to whether the "customer authorization code," "clerk authorization code," and general "authorization code" steps of the claims are present in the written description.

567     Ms. Breitzke's report and whether there is a written description of the claimed

568     invention.[12]

569         Because Ms. Breitzke is a qualified expert, her methodology is reliable, and her

570     opinion fits the facts of this case, CAT's motion to exclude her testimony is denied.[13]

---

[12] CAT makes two other arguments related to fit that are unpersuasive and do not affect my decision. First, CAT argues that Ms. Breitzke's opinion regarding obviousness of the independent claims lacks fit because it consists of "nothing more than a series of stock, conclusory statements" and "would not be helpful to a lay jury." (D.I. 108 at 12-13.) Although the portion of Ms. Breitzke's report explicitly opining on obviousness of the independent claims is sparse, her conclusions therein are supported by her detailed opinion on anticipation of those claims, *see Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1335 (Fed. Cir. 2005) (explaining that expert testimony regarding anticipation "might also support an argument of obviousness in the alternative"), and by her opinion on obviousness of the dependent claims, *see Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1344 (Fed Cir. 2009) ("A broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness."). Thus, that testimony will not be excluded.

Finally, CAT suggests that Ms. Breitzke's opinion does not fit because it is based on an incorrect claim construction. In her deposition, Ms. Breitzke had stated that the "clerk authorization code" and "customer authorization code" could make up the "general authorization code." (D.I. 125, Ex. R., Breitzke Dep. at 105:15-19.) According to CAT, that conflicts with Judge Stark's construction of general authorization code as "broader than the 'customer authorization code' and 'clerk authorization code' terms." (D.I. 108 at 15.) I find no inconsistency. Saying that the "broader" general authorization code might sometimes consist of a clerk or customer authorization code is little different than saying that a rectangle might sometimes be a square. CAT also argues that Ms. Breitzke's opinion is inconsistent with a proper construction of "debit purchase transaction." For the reasons discussed *supra* Part IV(A), I do not find Ms. Breitzke's opinion to be inconsistent with my construction of that term.

[13] CAT also renews its earlier request that the court strike Ms. Breitzke's rebuttal report based on CAT's allegation that the report contains new matter not covered in her initial report or in rebuttal of Dr. Grimes report. Although Judge Stark already addressed this issue, finding "that Breitzke's Rebuttal Report does not contain impermissible 'new' opinions," (D.I. 89 at 3), CAT claims that Ms. Breitzke admitted in her later deposition that she did "offer a new opinion ... in [her] rebuttal report." (D.I. 108 at 19 (quoting D.I. 125, Ex. R., Breitzke Dep. at 234:1-2).) CAT does not identify any specific "new" opinion in Ms. Breitzke's rebuttal, however, and a closer examination of Ms. Breitzke's

### C.    Written Description

A bit of additional background information is necessary to put the following discussion in context. Pursuant to an ex parte reexamination, dependent claims 21 and 32 of the '859 patent were canceled and the steps in those claims requiring entering of a clerk authorization code and a customer authorization code were incorporated as additional steps in the respective independent claims on which they rely, namely claims 20 and 29. *Ex Parte Reexamination Certificate No.* US 6,032,859 C1, October 5, 2010, Reexamination Request No. 90/009,459, April 30, 2009. Thus, after the reexam, independent claims 20 and 29 require three separate and distinct authorization codes to be entered: (1) a customer authorization code must be entered ('859 Reexam Cert. 2:1-2, 2:31-32); (2) a clerk authorization code must be entered by a clerk ('859 Reexam Cert. 2:3-4, 2:33-34; D.I. 61 at 20-21); and (3) a general authorization code must be entered through a keypad ('859 patent at 10:3-5, 11:11-13). Claims 20 and 29 also require the step of "entering confirmation of the sales transaction data by a customer." ('859 patent at 9:66-67, 11:6-7). The written description in the '859 patent, however, does not disclose any one method that includes all three of the code entering steps or any one method that includes all three of the code entering steps and the sales transaction data confirmation step.[14] Therefore, I will grant SVS's Motion for Partial Summary Judgment

---

deposition reveals that the "new" opinion to which she referred was offered "to rebut what Dr. Grimes said in his report." (D.I. 125 Ex. R., Breitzke Dep. 236:16-17.) Thus, there is no basis to disturb Judge Stark's finding.

[14] It appears then that CAT's recrafting of claims 20 and 29 during reexamination may have resulted in the inclusion of new matter (the three code process). That point

589    of Invalidity of Claims 20, 22-31, and 33-38 Due to Lack of Written Description (D.I.

590    167).[15]

591            *1.    CAT's Objections*

592            Despite the amendment of claims 20 and 29 during reexamination, CAT objects to

593    this Court raising *sua sponte* the potential invalidity of claims 20 and 29 of the '859

594    patent for failing to meet the written description requirement of 35 U.S.C. § 112, ¶ 1.  It

595    argues that SVS has waived that issue under Federal Rule of Civil Procedure 8(c) by

596    failing to plead it in SVS's original complaint.  CAT further asserts that it was improper

597    for me to grant leave to SVS to amend its complaint to include the allegation that claims

598    20 and 29 of the '859 patent are invalid under § 112, ¶ 1.  (D.I. 144, 148.)  Since all of

599    this additional labor has been a result of CAT's decision to amend its claims during

600    reexamination, it takes some chutzpah to mount those objections, but I will address them.

601            *a.    Under Rule 56(f), It Was Proper to Invite a Summary*
602                   *Judgment Motion on the Written Description Issue and to*
603                   *Rule on that Motion*
604

---

raises the interesting question of whether such an amendment during reexamination was even permissible.  As open-ended claims, the independent claims of the patent would have read on any method adding a new step to the claims.  However, another method that included new, non-obvious novel steps would have been independently patentable as an improvement – although infringing of the '859 patent if practiced.  Therefore, if the new matter added during reexamination (the three code process) was non-obvious novel matter, CAT would have broadened the scope of the claims for purposes of invalidity, but not infringement.  Whether that is permissible in reexamination is questionable, but that argument has not been raised here, and, in any event, I need not address it because the claims fail for lack of written description.

[15] SVS's motion is to invalidate independent claims 20 and 29 and dependent claims 22-28, 30, 31, and 33-38.

605 Contrary to CAT's objection, it was proper under Federal Rule of Civil Procedure

606 56(f) to raise the written description issue *sua sponte*. The newly amended Rule 56(f)

607 provides that "[a]fter giving notice and a reasonable time to respond, the court may ....

608 grant [a] motion [for summary judgment] on grounds not raised by a party; or ... consider

609 summary judgment on its own after identifying for the parties material facts that may not

610 be genuinely in dispute." FED. R. CIV. P. 56(f). The Committee's Notes explain the

611 scope, content, and purpose of that amendment to the Rules in more detail:

612 Subdivision (f) brings into Rule 56 text a number of related procedures that
613 have grown up in practice. After giving notice and a reasonable time to
614 respond the court may grant summary judgment ... *on legal or factual*
615 *grounds not raised by the parties*; or consider summary judgment on its
616 own. In many cases *it may prove useful first to invite a motion* ... .
617
618 FED. R. CIV. P. 56(f) Advisory Committee's Notes (2010) (emphasis added). The written

619 description issue was a legal ground not raised by either party, and I invited a summary

620 judgment motion on it. By the plain language of Rule 56, it was well within the power

621 and discretion provided by Rule 56 to raise the written description issue *sua sponte*. FED.

622 R. CIV. P. 56(f).

623 Because CAT was given ample "notice and opportunity to respond" to the

624 potential invalidity of claims 20 and 29 for failing to meet the written description

625 requirement of § 112, ¶ 1, I can now properly rule on the invited motion. At my request

626 (D.I. 138), the parties filed opening, answering, and reply briefs addressing whether the

627 '859 patent's written description is adequate under 35 U.S.C. § 112, ¶ 1 (D.I. 143, 144,

628 145, 146, 148, 149, 168, 171, 172). Oral argument on that issue was held on March 25,

629 2011. (D.I. 159.) Additional expert discovery was completed on the issue. (D.I. 154,

630    155, 156, 157, 160, 161). Another round of briefing was permitted after that discovery in

631    order to allow the parties to address the adequacy of the written description of the '859

632    patent in briefing that would benefit from that expert discovery. (D.I. 168, 171, 172).

633    Moreover, the timing of the discovery and briefing that followed oral argument matched

634    that which CAT represented to the Court would eliminate any possible prejudice and

635    provide adequate time for it to address the adequacy of the written description for claims

636    20 and 29 of the '859 patent. (D.I. 159, transcript of March 25, 2011 hearing, 74:14-21

637    ("THE COURT: But in terms of prejudice … is there anything else that would have to

638    happen besides that two months to open the record… MR. PETERSON: Your Honor, not

639    that I can think of as far as – you know, it can be done, your Honor … .").) Thus, given

640    the additional discovery and briefing, CAT has not been prejudiced by my raising the

641    written description issue, ruling on SVS's invited summary judgment motion is

642    appropriate. *See* FED. R. CIV. P. 56(f); *see also Ultra-Precision Mfg., Ltd. v. Ford Motor

643    Co.*, 411 F.3d 1369, 1376-77 (Fed. Cir. 2005). (affirming a district court's allowance of a

644    federal patent law preemption affirmative defense that was invoked for the first time in a

645    defendant's motions in limine, after the district court had raised the issue *sua sponte* in

646    denying defendant's motion for summary judgment and permitted the parties to submit

647    briefing and participate in oral argument on the issue).

648                    b.      *SVS Has Not Waived the Written Description Issue Under*
649                            *Rule 8(c)*

650            CAT asserts that 35 U.S.C. § 282(3) requires defenses involving the validity or

651    infringement of a patent to be pleaded. CAT points out that the Federal Circuit held in a

35

652  non-precedential opinion, *Bradford Co. v. Jefferson Smurfit Corp.*, 2001 WL 35738792,

653  *9 (Fed. Cir. Oct. 31 2001), that § 282(3) is the "patent statute's analogy" to Federal Rule

654  of Civil Procedure 8(c). (D.I. 146 at 3.). Therefore, as CAT sees it, SVS's failure to

655  raise a 35 U.S.C. § 112, ¶ 1 claim in its original pleadings precludes it from asserting that

656  claim now. *See Systems, Inc. v. Bridge Elecs. Co.*, 335 F.2d 465, 466 (3d Cir. 1964)

657  ("An affirmative defense which is neither pleaded as required by Rule 8(c) nor made the

658  subject of an appropriate motion under Rule 12(b) is waived.").

659       Assuming that the strictures of Rule 8(c) apply, I conclude that SVS has not

660  waived its written description argument. "Regional circuit law governs the question of

661  waiver of a defense." *Ultra-Precision*, 411 F.3d at 1376 (Fed. Cir. 2005). "Courts in [the

662  Third] Circuit … have taken a more forgiving approach to parties who fail to raise

663  affirmative defenses in an answer, as courts have held that the failure to raise an

664  affirmative defense by responsive pleading or appropriate motion does not always result

665  in waiver." *Sultan v. Lincoln Nat'l Corp.*, 2006 WL 1806463, at *13 (D.N.J. June 30,

666  2006) (citing *Prinz v. Greate Bay Casino Corp.*, 705 F.2d 692 (3d Cir. 1983)).

667       Under Fed.R.Civ.P. 15(a), a responsive pleading may be amended at any
668       time by leave of court to include an affirmative defense, and leave shall be
669       freely given when justice so requires. Unless the opposing party will be
670       prejudiced, leave to amend should generally be allowed. … It has been
671       held that a defendant does not waive an affirmative defense if [h]e raised
672       the issue at a pragmatically sufficient time, and [the plaintiff] was not
673       prejudiced in its ability to respond.
674
675  *Charpentier v. Godsil*, 937 F.2d 859, 863-64 (3d Cir. 1991) (internal quotation marks and

676  citations omitted); *see also Chainey v. Street*, 523 F.3d 200, 210 n.5 (3d Cir. 2008) ("The

677  purpose of requiring the defendant to plead available affirmative defenses in his answer is

678  to avoid surprise and undue prejudice by providing the plaintiff with notice and an

679  opportunity to demonstrate why the affirmative defense should not succeed."); *Cetel v.*

680  *Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006) (stating that "affirmative

681  defenses can be raised by motion, at any time (even after trial), if plaintiffs suffer no

682  prejudice").  To determine if an affirmative defense has been waived:

683  [T]he District Court must exercise its discretion and determine whether
684  there was a reasonable modicum of diligence in raising the defense.  The
685  District Court must also consider whether the plaintiff has been prejudiced
686  by the delay. ... In particular, the Court must inquire whether the
687  defendants violated any scheduling orders in raising the defense for the first
688  time in their summary judgment motions, whether they delayed asserting
689  the defense for tactical purposes or any improper reason, and, most
690  important, whether the delay prejudiced the plaintiff's case.
691
692  *Eddy v. Virgin Islands Water and Power Auth.*, 256 F.3d 204, 210 (3d Cir. 2001)

693  (reversing and remanding a District Court's holding that a defendant had waived the

694  affirmative defense of qualified immunity by raising it for the first time on summary

695  judgment).

696      Here, SVS did not fail to raise the written description issue to gain a tactical

697  advantage; CAT has not been prejudiced by SVS's failure to raise the issue in the original

698  complaint; and justice requires that this Court find the claim has not been waived.  I, not

699  SVS, raised the written description issue for the first time, and I did so based on CAT's

700  amendment of the patent.  (D.I. 138).  SVS could not have predicted for tactical purposes

701  that I would raise the issue.  Because of the additional discovery and briefing I ordered,

702  CAT has had a full opportunity to address the written description issue here.  Again, it

703  was CAT's actions during the ex parte reexamination of the '859 patent, which concluded

704 more than a year after the filing of the original complaint, that has created the written

705 description problem now at issue. Thus, it would be unjust to say that SVS has waived

706 its right to assert that claims 20 and 29 of the '859 patent are invalid under § 112, ¶ 1.

707 *See, e.g., Ultra-Precision*, 411 F.3d at 1376-77; *Kleinknecht v. Gettysburg College*, 989

708 F.2d 1360, 1373-74 (3d Cir. 1993) (considering immunity defense under Pennsylvania's

709 Good Samaritan law that defendant raised for the first time in its summary judgment

710 motion); *Charpentier*, 937 F.2d at 864 (permitting a New Jersey Tort Claims Act-based

711 immunity affirmative defense raised for the first time by a defendant who joined a co-

712 defendant's trial brief).

713                   *c.*      *It Was Proper for the Court to Grant Leave to SVS to Amend*
714                                    *Its Complaint*

715       Pleadings may be amended at any time before trial with leave of court, which

716 should be provided freely "when justice so requires." FED. R. CIV. P. 15(a). Here, as

717 discussed above, justice requires that SVS be permitted to amend, since CAT took

718 actions after the filing of the original complaint that created the grounds for SVS to

719 amend. The amendment to the complaint here, however, also is effectively a change to

720 the scheduling order in this case, which provided that amendments to pleading be

721 completed by December 10, 2009. (D.I. 16 at 3.) Motions to amend which operate to

722 change the scheduling order must comply not only with Rule 15(a) but also with Federal

723 Rule of Civil Procedure 16(b). *E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 340

724 n.18 (3d Cir. 2000). Rule 16(b)(4) requires consent of the Court and that good cause

725 exist before amending a scheduling order. FED. R. CIV. P. 16(b)(4). Whether a party

726    sought amendment of the pleading in a diligent and timely manner is properly considered

727    by the Court when determining if good cause exists. *Samick Music Corp. v. Delaware*

728    *Music Indus., Inc.*, 1992 WL 39052, at *6-7 (D.Del. Feb. 12, 1992). The decision to

729    permit amendment, however, rests squarely with the discretion of the Court. *Mahan*, 225

730    F.3d at 339-40.

731        In this case, good cause exists. CAT's amendments to claims 20 and 29 came

732    after the deadline for amending pleadings under the scheduling order had already passed.

733    (*See* D.I. 16; Ex Parte Reexamination Certificate No. US 6,032,859 C1, October 5, 2010,

734    Reexamination Request No. 90/009,459, April 30, 2009.) The timing of the amendments

735    made during reexamination – and the interest of judicial efficiency – weigh in favor of

736    finding good cause to grant SVS leave to amend its pleading to include the averment that

737    claims 20 and 29 of the '859 patent are invalid under 35 U.S.C. § 112, ¶ 1.

738        2.    *Written Description Analysis*[16]

739        Independent claims 20 and 29, and the claims that depend from them, fail to meet

740    the written description requirement in 35 U.S.C. § 112, ¶ 1. As noted above, after

741    reexam, independent claims 20 and 29 require three separate and distinct authorization

742    codes to be entered: (1) a customer authorization code must be entered ('859 Reexam

743    Cert. 2:1-2, 2:31-32); (2) a clerk authorization code must be entered by a clerk ('859

744    Reexam Cert. 2:3-4, 2:33-34; D.I. 61 at 20-21); and (3) a general authorization code must

745    be entered through a keypad ('859 patent at 10:3-5, 11:11-13). Claims 20 and 29 also

---

[16] SVS has not asserted that independent claims 1 and 10 are invalid under 35 U.S.C. § 112, ¶ 1.

746     require the step of "entering confirmation of the sales transaction data by a customer."

747     ('859 patent at 9:66-67, 11:6-7). However, I cannot discern in the '859 patent any

748     method that includes all three of the code entering steps or any one method that includes

749     all three of the code entering steps and the sales transaction data confirmation step.

750         The written description of the '859 patent consists almost exclusively of detailed

751     descriptions of five preferred embodiments of the claimed methods which, along with the

752     accompanying figures, provide the sole references outside of the claims to authorization

753     codes. Those preferred embodiments are methods for processing: (1) ATM/Debit

754     purchase transactions; (2) phone card purchase transactions; (3) cellular telephone

755     purchase (i.e., activation) transactions; (4) prepaid debit purchase transactions; and (5)

756     hybrid prepaid debit/phone card purchase transactions. The following is a list of the

757     relevant claimed steps disclosed and not disclosed in the written description for each of

758     those preferred methods. As outlined, each embodiment is missing at least one of the

759     required elements of claims 20 and 29.

760               *a.*     *ATM/Debit Transactions*

761     *Relevant steps disclosed:*

762      1. Customer authorization code must be entered: customer enters PIN number.

763        (3:34.)

764      2. Sales transaction data confirmation by a customer: "customer will have the option

765        to confirm" (3:36)

766     *Relevant steps not disclosed:*

767      1. Clerk authorization code must be entered by a clerk.

768     2. General authorization code must be entered through a keypad.

769                  *b.*     *Phone Card Transactions*

770     *Relevant steps disclosed:*

771     1. Customer authorization code must be entered.[17]

772         a. Once paid, customer or clerk swipes phone card through the reader to read

773               the encoded account number which can be magnetic stripe, bar code, OCR

774               characters, or chip based card memory. (3:67-4:10.) Pursuant to the claim

775               construction opinion adopted by this Court, reading the account number on

776               the card might be read as entering a customer authorization code. (*See* D.I.

777               61 at 16-20.) [18]

778     2. Clerk authorization code must be entered by a clerk: clerk enters and confirms

779         collected amount for payment with "an authorization number." (4:10-12.)

780     *Relevant steps not disclosed:*

---

[17] The written description does state that a "customer can pay in either cash, ATM/Debit Card or credit card. If any 'cashless' method of payment is selected it will be processed first in the way described above [for ATM/Debit transactions]." (3:65-67.) If the step of payment with an ATM card is read as part and parcel with this method, then the customer authorization code and customer confirmation of sales transaction data steps are satisfied because that payment method, as shown above, discloses the entry of a customer authorization code. However, the description clearly states that the cashless method payment is processed "first" (3:67), and the flow chart referenced by the disclosure shows that the cashless method of payment is a completely separate transaction, (Fig. 2).

[18] I am, of course, viewing all facts in the light most favorable to CAT on summary judgment. I note, however, that it is a strained reading to say that the account number is the customer authorization code. Both claims 20 and 29 include the separate step of "reading a debit styled card through the card reader for providing card data to the computer." (10:1-2, 11:9-10.) It seems implicit then that the "card data" (10:2; 11:9), which would appear to be the account number, is not the customer authorization code.

1. General authorization code must be entered through a keypad.[19]

---

[19] In response to SVS's motion for summary judgment on written description, CAT asserts that a general authorization code is disclosed by the "terminal ID" (4:13, D.I. 171 at 5-6, 14-19.) CAT's argument boils down to its claim that the terminal ID is a general authorization code because "[i]t is a precondition for establishing communication with a host computer." (D.I. 171 at 6.) CAT confuses the ultimate effect of the terminal ID with the purpose of it. The terminal ID is not entered "to establish a communication link with a host data processor," as required by the Court's construction of the term. (D.I. 61 at 28.) Nor is it entered "for having the computer initiate communication with the host data processor," as required by the language of the claims themselves. (10:3-5, 11:11-15.) As CAT expressly states, "[t]he purpose of a terminal ID is to inform the host data processor from which merchant and terminal the communication is coming." (D.I. 171 at 6; *see also* D.I. 170, Ex. I, Dep. of J. Grimes at 40:9-17, 154:7-17 (CAT's expert Grimes describing the terminal ID as "an address for the terminal so that the message ... gets routed to the correct terminal" and clearly explaining that the entry of the terminal ID does not cause anything to happen, including calling a host).) While the effect of entering the terminal ID might ultimately be that a communication link is successfully established, ignoring the purpose of entering the code would cause any other series of numbers and/or letters entered during a debit purchase transaction to become a general authorization code if the transaction would not proceed without them. That exceptionally broad definition would include such "preconditions" to communication with a host data processor as entry of sales transaction data by a clerk, entry of confirmation sales transaction data by a customer, entry of a PIN number by a customer, or any number of other conceivable series of letters and/or numbers that could ever be entered during a transaction, e.g. the entry of an employee ID number or the entry of a code to power on a countertop terminal. Simply put, the plain language of the claims requires the general authorization code to be entered for a particular purpose, that is "for having the computer initiate communication with a host data processor." (10:3-5, 11:11-13.) A terminal ID does not have that purpose, as CAT appears to acknowledge. (D.I. 171 at 6.) No reasonable jury could conclude otherwise.

Furthermore, even if CAT were correct that the general authorization code is disclosed in the phone card transaction method, the '859 patent still lacks adequate written description under § 112, ¶ 1. Section 112, ¶ 1 requires a patent to "describ[e] the invention, with *all* its claimed limitations." *Lockwood*, 107 F.3d at 1572 (emphasis added and removed). Put another way, the possession requirement contained in § 112, ¶ 1 demands that the written description of a patent must "show that the inventor actually invented *the invention claimed*"; it is not adequate to show the existence of *individual elements* of a claimed invention in a variety of separate and distinct inventions that, when taken together, would "merely render[] the invention obvious." *Ariad*, 598 F.3d at 1351-52 (emphasis added). The phone card transaction method described in the written description does not contain the step of entering customer confirmation of sales

782    2. Customer confirmation of sales amount.[20] In this preferred embodiment, the clerk,

783    not the customer, confirms sales transaction data. (4:11-12.)

784         *c.     Cellular Phone Activation Transactions*

785  *Relevant steps disclosed:*

786    1. Clerk authorization code must be entered by a clerk: the clerk is prompted to

787    collect amount and confirm that it was collected by entering an authorization code

788    on the remote keypad. (4:66-5:1.)

789  *Relevant steps not disclosed:*

790    1. Customer authorization code must be entered.[21]

791    2. General authorization code must be entered through a keypad.

792    3. Sales transaction data confirmation by a customer.[22]

---

transaction data. The step of entering confirmation of the sales transaction data is not inherent in any other step described as occurring in the phone card transaction. Indeed, it was even considered novel by the PTO to combine the step of entering customer confirmation of sales transaction data with the step of entering confirmation of the sales transaction data by a clerk. *See Grant of Reexam*, 90/011,146 at 4, Feb. 11, 2011. Therefore, regardless of whether the phone card transaction method contains the step of entering a general authorization code, the description of that transaction method still is not an adequate description of the claimed invention in 20 or 29 that includes all of the claimed limitations. *See Lockwood*, 107 F.3d at 1572. Assuming then, for the sake of argument, that CAT is correct and the general authorization code is disclosed, no reasonable jury could conclude that the '859 patent has disclosed that the inventors of the '859 patent reasonably conveyed to those skilled in the art that they were in possession of the invention claimed in claims 20 and 29 to clearly allow a recognition that the inventors invented what is claimed. *See Ariad*, 598 F.3d at 1351.

[20] *See supra* note 17.

[21] *See supra* note 17.

[22] *See supra* note 17.

793               *d.*      *Prepaid Debit Transactions*

794   *Relevant steps disclosed:*

795     1. None.

796   *Relevant steps not disclosed:*

797     1. Clerk authorization code must be entered by a clerk.

798     2. Customer authorization code must be entered.[23]

799     3. General authorization code must be entered through a keypad.

800     4. Sales transaction data confirmation by a customer.[24]

801               *e.*      *Hybrid Prepaid Debit/Phone Card Transactions*

802   *Relevant steps disclosed:*

803     1. Clerk authorization code must be entered by a clerk. A decision is made to add

804        value to card or not (7:12-13):

805          a.  *"If no value is to be added to the card and a purchase is to be made* **412**,[25]

806            the clerk enters the amount of the purchase and activates the system for

807            transmitting." (7:19-21, emphasis added.) The clerk might "activate the

808            system" with a code.[26]

---

[23] *See supra* note 17.

[24] *See supra* note 17.

[25] The numbers in bold are included in the text of the patent and refer to numbers on the Figures.

[26] It might be read that the clerk could also "activate" the system by entering the general authorization code. CAT has previously asserted however, that the step referred to here is the entry of a clerk authorization code. (D.I. 145, Ex. H, CAT Response to Office Action in Ex Parte Reexamination 90/009,045 at 7 ("the clerk activates the system (e.g., by entering a clerk authorization code)").)

809        b. *"If value is to be added*, an amount is selected **404**, payment is made to the

810             clerk wherein the clerk confirms that payment has been made **406**." (7:13-

811             15, emphasis added.)  The clerk might confirm payment by entering a clerk

812             authorization code.

813    *Relevant steps not disclosed:*

814       1.  Customer authorization code must be entered.[27]

815       2.  Sales transaction data confirmation by a customer.[28]

816       3.  General authorization code must be entered through a keypad.

817    Therefore, the written description does not contain any explanation, description, or

818    disclosure whatsoever of a method for processing debit purchase transactions which

819    includes the step of entering a general authorization code.  Nor does it contain such

820    disclosure of any method which includes the all the steps of entering a clerk authorization

821    code by a clerk, entering a customer authorization code, entering a general authorization

822    code through a keypad, and entering sales transaction data confirmation by a customer.

823    Those steps are not unimportant to the novelty and nonobviousness of the claimed

824    methods.  On September 28, 1999, the PTO issued a Notice of Allowance which stated

825    the following reasons for allowance:

826        The best prior art of record, Gutman et al, Nair et al, and Levine et al, taken
827        alone or in combination fails to specifically teach or fairly suggest the steps
828        of entering a customer [code *sic*] authorizing access to a customer data base
829        of a host processor, and entering a clerk authorization code for initiating a
830        debit purchase transaction; and the steps of entering sales data by the clerk,

---

[27] *See supra* note 17.

[28] *See supra* note 17.

831   and entering confirmation of the sales data from the customer as set forth in
832   the claims.
833
834 *See Grant of Reexam*, 90/011,146 at 4, Feb. 11, 2011.

835    Those reasons for allowance are clearly associated with claims 1 and 10 as a pair

836 and claims 20 and 29 as a pair.  Simply put, claims 1 and 10 were allowed as novel and

837 nonobvious because they contained the limitation of entering both a clerk and customer

838 authorization code, and claims 20 and 29 were allowed as novel and nonobvious because

839 they contained the limitation of the clerk entering sales data and the customer confirming

840 that sales data.  (The original examiner of the '859 patent application found that the

841 general "authorization code" of claims 20 and 29 did not make them patentable material.

842 *March 8, 1999 Office Action* (rejecting claims over Gutman patent which taught the entry

843 of the general authorization code); *see Markman Report and Recommendation* (D.I. 61 at

844 19.).)

845    During the more recently completed reexamination of the '859 patent, claims 20

846 and 29 were rejected as originally drafted as being anticipated by U.S. Patent No.

847 5,278,752 ("*Narita*").  CAT responded to that rejection by asserting that *Narita* failed to

848 disclose "entering an authorization code."  *Reexam Final Rejection* at 4, Reexam No.

849 90/009,459,  May 27, 2010.  The reexaminer rejected that argument, however, finding

850 "Narita's disclosure of a customer entering his PIN as the entering of the authorization

851 code" because "[a] PIN by its nature is used to authorize a transaction by authenticating

852 the card holder as an authorized user of the account."  *Id.* at 6-7.  The reexaminer did,

853 though, allow dependent claims 21 and 32 over Narita because Narita discloses only that

854     a clerk would enter an "article code," such as a UPC code or other "product identifier" to

855     initiate a transaction, which the PTO concluded was not a clerk authorization code. *Id.* at

856     8.

857             After the final rejection letter, CAT mailed a copy of the claim construction order

858     to the PTO and proposed amending claims 20 and 29 to include all the claims of

859     dependent claims 21 and 32 and cancelling those dependent claims. *Response to Final*

860     *Rejection* at 2-3, Reexam No. 90/009,459, June 10, 2010. In its response to the final

861     rejection, CAT asserted that "claims 21 and 32 were patentable/confirmed because 'the

862     clerk authorization code for initiating a debit purchase transaction' limitation in those

863     claims is not taught or suggested by the cited *Narita* reference." *Id.* at 4.

864             CAT did not, however, merely suggest replacing the "entering an authorization

865     code" step in the independent claims with that of entering both the clerk and the customer

866     authorization codes. It *added* both steps to the independent claims. Whatever may have

867     been the motivation for that addition,[29] it resulted in claims 20 and 29 as written today,

868     which require three separate and distinct codes to be entered and a customer to confirm

869     the sales transaction data entered by a clerk.

870             Because no single method for processing debit purchase transactions in which

871     those four steps are included is described,[30] the written description in the '859 patent does

---

[29] It appears that eliminating the "entering an authorization code" step from claims 20 and 29 would have contradicted the position CAT took during *Markman* briefing that there were three distinct codes claimed in the patent. *See Markman Report and Recommendation* (D.I. 61 at 23; *CAT Markman Brief* D.I. 44 at 32.)

[30] Again, those four steps are: (1) a customer authorization code must be entered

872  not describe the methods claimed in independent claims 20 and 29 sufficiently to allow a

873  reasonable jury to determine that those claims are supported by a written description that

874  would "convey with reasonable clarity to those skilled in the art that, as of the filing date

875  sought, [the patentee] was in possession of the invention." *Centocor*, 636 F.3d at 1348

876  (internal quotation marks omitted); *see Carnegie Mellon*, 541 F.3d at 1122. That

877  conclusion is proper at the summary judgment stage and, as here, may be based "solely

878  on the face of the patent specification." *Centocor*, 636 F.3d at 1347. Therefore, claims 20

879  and 29, and their respective dependent claims,[31] i.e., claims 22-28, 30, 31, and 33-38, are

880  invalid pursuant to 35 U.S.C. § 112, ¶ 1.

881  **D.    *Anticipation***

882    SVS asserts that the MicroTrax Ltd. Electronic Payment Software, PC Electronic

883  Payment Systems Reference Manual ("MicroTrax Manual" or the "Manual") (D.I. 106

884  Ex. A-4) anticipates claims 1-3, 5-14, 16-20, 22, 24-31, 33, and 35-38 of the '859 patent.

885  (D.I. 103 at 3-20.) The Manual was distributed with the MicroTrax Ltd. Electronic

---

('859 Reexam Cert. 2:1-2, 2:31-32); (2) a clerk authorization code must be entered by a
clerk ('859 Reexam Cert. 2:3-4, 2:33-34; D.I. 61 at 20-21); (3) a general authorization
code must be entered through a keypad ('859 patent at 10:3-5, 11:11-13); and (4)
"entering confirmation of the sales transaction data by a customer" ' '859 patent at 9:66-
67, 11:6-7).

[31] None of the claims remaining after reexamination that depend on claims 20 or
29 alter the manner in which the limitations in claim 20 and 29 that the claimed method
must include the steps of entering a clerk authorization code by a clerk, entering a
customer authorization code, entering a general authorization code through a keypad, and
entering sales transaction data confirmation by a customer. Therefore, they are likewise
invalid under § 112, ¶ 1 for lack of written description. *See LizardTech, Inc. v. Earth
Resource Mapping, Inc.*, 424 F.3d 1336, 1345-47 (Fed. Cir. 2005) (invalidating
dependant claims when the independent claim was invalid under § 112 ¶ 1).

886      Payment Software which was used by retailers in a point-of-sale system to permit, among

887      other things, the use of Automated Teller Machine ("ATM") cards by customers to

888      purchase and return goods. (Manual at 2-14; D.I. 106 Ex. A, Lineck Dep. at 13:11-13;

889      17:12-19.) One of the founders of MicroTrax Ltd., Mr. Lineck, testified that the

890      MicroTrax Ltd. Electronic Payment Software supported by the Manual was installed in at

891      least 30 grocery stores in California in 1989 (Lineck Dep. at 19:2-6), that the Manual was

892      provided to those customers (Lineck Dep. at 17:25-18:21), and that the version of the

893      Manual provided to customers in 1989 included all of the transaction types listed at page

894      2-14 of the Manual (Lineck Dep. at 55:9-56:8).[32] Moreover, the physical copy of the

895      Manual before the Court bears copyright insignia dated 1994 and 1995 (Manual at cover

896      page bearing Bates number L000003, rear cover bearing Bates number L000381),

897      consistent with testimony by Mr. Lineck that the software supported by the Manual was

898      updated in 1995. Therefore, there is no reasonable dispute that the Manual qualifies as

899      § 102(a) prior art because it is relevant to the field of electronic payment systems and was

900      printed and disseminated to the public before the undisputed presumed earliest invention

901      date in this case, September 18, 1996.[33] *Bausch & Lomb*, 796 F.2d at 449 (explaining

---

[32] Because the Manual thoroughly describes a device that had been in public use already, no reasonable jury could conclude that it is not enabling.

[33] CAT asserts that the Manual cannot be prior art because Lineck's testimony that it was publicly known cannot be corroborated by documentary evidence. (D.I. 123 at 9-13). CAT relies on a line of cases in which the Federal Circuit has held that a supposed inventor's testimony alone cannot serve to invalidate a patent without corroborating evidence such as documentation of sale or invention. (D.I. 123 at 9, citing, among other cases, *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007)). CAT misapplies that precedent here. The corroboration requirement arises primarily from the

902    that "the date of invention [is] presumed to be the filing date of the application until an

903    earlier date is proved").

904            Claims 1-3, 5-7, 9-14, and 16-19 are invalid as anticipated by the Manual under 35

905    U.S.C. § 102(a).[34] The Manual discloses two relevant methods for processing debit card

906    purchase transactions: one for the purchase of goods with the OMNI 490 ("ATM

907    Purchase" transaction) and one for the return of goods using the OMNI 490 ("ATM

908    Return" transaction).[35] In those methods, the Manual discloses each and every limitation

---

concern that "[c]onception ... be proved by corroborating evidence which shows that the inventor disclosed to others his completed thought expressed in such clear terms as to enable those skilled in the art to make the invention," as the Federal Circuit explained in *Coleman v. Dines*, 754 F.2d 353, 359 (Fed. Cir. 1985) (internal quotations omitted). SVS is not relying solely on Mr. Lineck's testimony as a claim that he was the first inventor of the inventions claimed in the '859 patent. SVS is relying on Mr. Lineck's testimony to support the reasonable inference that a user manual for software dated 1995 was known to the public in 1995. Mr. Lineck's testimony to that fact does not itself require corroboration. CAT has chosen to contradict Mr. Lineck's testimony and the physical copy of the Manual in the record not with opposing factual evidence but with a twisted reading of Federal Circuit precedent that would require fact witnesses to – as a matter of law – provide documentary evidence to support any testimony they give regarding a printed piece of prior art. Mr. Lineck's testimony stands unopposed in the record that the Manual's copyright dated 1995 accurately indicates the latest date at which the public would have reasonably been expected to know the contents of the Manual. SVS need not provide corroborating evidence to Mr. Lineck's corroborating testimony that the Manual was known to the public at the latest in 1995.

[34] Because I have found claims 20, 22, 24-31, 33, and 35-38 to be invalid for failing to provide adequate written description required under 35 U.S.C. § 112 ¶ 6, I do not address SVS's assertions that those claims are invalid as anticipated.

[35] Given the Court's construction of "purchase transaction," the method for crediting the account associated with an ATM card described in the Manual as an ATM Return transaction is a "method for processing debit purchase transactions" within the meaning of the claims of the '859 patent: it is a "transaction[] that increase[s] the purchasing value of ... a debit styled card [an ATM card]." *See supra* Part IV(A).

909 of the methods in claims 1-3, 5-7, 9-14, and 16-19 as arranged in those claims, as shown

910 below.

911 *Claim 1:*

912 Each and every element of claim 1 is anticipated by both the ATM Purchase and

913 ATM Return transactions disclosed by the Manual, as shown as follows:

914 • **A method for processing debit purchase transactions**

915 Combining the constructions of the Court, "debit purchase transactions" are

916 "transactions with the intended effect of decreasing the purchasing value of,

917 increasing the purchasing value of, or activating a [card having a value in an

918 associated account or a value stored on the card itself] made using a [card having a

919 value in an associated account or a value stored on the card itself]."[36] (*Supra part*

920 IV(A); D.I. 61 at 15.) The ATM Purchase and ATM Return methods disclose a

921 method that "electronically processes the payment of goods at the point-of-sale"

922 (Manual at 2:14[37]) and the value of the account associated with an ATM card is

923 decreased (2:15-2:19) or increased (2:28-2:31) after "a customer slides an ATM

924 card." (2:14, 2:29.)

925 **[the method comprising the steps of:]**

---

[36] The bracketed language is the Court's construction of the term "debit styled card." (D.I. 61 at 15.)

[37] In this section, for ease of use, I refer to pages in the Manual by reference to the chapter and page numbers in the document itself, i.e. 2:14 means Chapter 2 of the Manual at page 14. Unless otherwise stated in a citation in this section, these citations are to the Manual, not the '859 patent.

926    •   **providing a counter-top terminal having telecommunications means operable**

927      **with a computer,**

928      The Court has defined "telecommunications means" as a means-plus-

929      function element with the function being "communicating with a host data

930      processor" and the associated structure being a "modem or its equivalent." (D.I.

931      61 at 10.) The Manual discloses that the OMNI 490 with checker display is a

932      counter-top terminal, (2:1-4) having telecommunications means operable with a

933      computer[38] ("[t]he transaction [using the OMNI 490] is routed through the

934      MicroTrax controller via a telephone line connection to the host processor for

935      approval," (2:14); the OMNI 490 "[g]enerates authorization requests, sends them

936      to the EPS network via the store controller, and displays the host response," (2:1);

937      the OMNI 490 communicates with the store controller over a local area network,

938      LAN, (1:62-63, 4:1-3; 5:1-9)).

939    •   **at least one keypad for data entry to the computer, a display responsive to the**

940      **computer, and a card reader communicating with the computer**

941      The Manual discloses that the OMNI 490 has at least one keypad for data

942      entry (1:75, 2:3-6; 2:14, 2:16), a display responsive to the computer (2:18-19,

---

[38] Whether "operable with a computer" is interpreted to mean that the terminal itself is a computer or that it operates with an external computer, such as the controller, the OMNI 490 is operable with a computer. (*See* 1:4 (referring to the controller as an "EPS computer"), 5:1-12 (describing the terminal as having an operating system, memory, and a LAN address).) For the same reason, I find unpersuasive CAT's argument that Ms. Breitzke failed to address this point. (D.I. 110 at 5-6.)

943      2:30-31), and a card reader for communicating with the computer (2:15, 2:20,

944      2:29).

945      • **for modifying purchasing value of a card in response to card use,**

946            The Court has defined "purchasing value of a card in response to card use"

947      as "a value stored on a card itself or a value in an account associated with a card

948      (but not limited to situations where the card holder has a business arrangement

949      with the host data processor." (D.I. 61 at 16.)  The Manual discloses that the ATM

950      Purchase and ATM Return transactions are methods in which the OMNI 490 with

951      checker pad counter-top terminal is used for modifying the value of the account

952      associated with an ATM card by decreasing such value (2:15-2:19) or increasing

953      such value (2:28-2:31) after "a customer slides an ATM card" (2:15, 2:29).

954      • **entering transaction data to the computer through keypad data entry**

955            The Manual discloses that transaction data is entered to the computer

956      through keypad data entry: "[t]he purchase amount and cashback amount, if any,

957      are entered by the checker on the checker device located in the lane" (2:14; *see*

958      *also* 2:16-17) or a checker enters the amount of return (2:30) through a keypad

959      (2:30).

960      • **reading a debit styled card through the card reader for providing card data to**

961      **the computer**

962            The Court has construed "debit styled card" to include ATM cards.  (D.I.

963      61 at 10-15.)  In both relevant debit purchase transaction methods disclosed by the

964    Manual, an ATM card is read through the card reader for providing card data to
965    the computer.  (2:1, 2:14, 2:15, 2:29.)

966    • **entering a customer authorization code for authorizing access to a customer**
967       **data base of a host data processor**

968       The Court has construed that step as "a series of numbers and/or letters, or
969    a combination thereof, which may be entered via the keypad by the customer or
970    may be on the card itself, for authorizing access to a customer data base of a host
971    data processor" (D.I. 61 at 20), which includes a PIN number associated with an
972    ATM card.  (D.I. 61 at 17.)  In both relevant debit purchase transaction methods
973    disclosed by the Manual, an ATM card PIN number is entered by a customer
974    through a keypad of the OMNI 490.  (2:1, 2:3, 2:14, 2:15-16, 2:29.)

975    • **entering a clerk authorization code for initiating a debit purchase transaction;**

976       The Court has construed that step as "the clerk enters a series of numbers
977    and/or letters, or a combination thereof, which permits the initiation of a debit
978    purchase transaction." (D.I. 61 at 21.)  The entry of the clerk authorization code
979    does not have to be through a keypad.  (D.I. 61 at 21.)  In both relevant debit
980    purchase transaction methods disclosed by the Manual, a clerk authorization code
981    is entered.

982       In both transactions, a "1 to 9 digit number" "checker ID" is entered by a
983    checker to "open[] the [OMNI 490] lane equipment and allow[] the terminal to
984    accept electronic payments." (2:7, 2:8-10.)  Thus, the Manual discloses the entry
985    of a clerk authorization code.

54

986     CAT makes two unpersuasive arguments why the checker ID could not be

987     the clerk authorization code. First, it asserts that the checker ID is not required for

988     every transaction, i.e. the clerk does not have to reenter the code for each

989     transaction. (D.I. 123 at 24.) That argument, however, ignores the fact that

990     entering the checker ID is a necessary step to proceed with, at a minimum, the first

991     transaction a checker completes. (2:15, 2:28.)

992     Second, CAT asserts that the checker ID is "at best, a disclosure of the

993     'general authorization code' as set forth in [claims 20 and 29 of] the '859 Patent"

994     (D.I. 123 at 25), an argument with which its expert agrees (D.I. 105 Ex. G, Grimes

995     Rebuttal Report, at 17-18).[39] To support its contention, CAT points to an office

996     action issued during the prosecution of the '859 patent, during which the examiner

997     found that a "password [to be] entered [by a user] before proceeding with other

---

[39] Although I consider Dr. Grimes's reports in my opinion, they are not properly in the record on summary judgment. It has been black letter law in the Third Circuit for over two decades that a "purported expert's report is not competent to be considered on a motion for summary judgment" if the "report was not sworn to by the alleged expert." *Fowle v. C&C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) (citing to *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17 (1970) (holding that an unsworn statement does not satisfy Rule 56(e).)). Unlike the substance of Ms. Breitzke's report (*see* D.I. 104; D.I. 169), the substance of Dr. Grimes's report was not sworn to by its author (*see* D.I. 105, Ex. G; D.I. 171, Ex. 1). Therefore, Dr. Grimes's expert report is not competent evidence at this point. *See Fowle*, 868 F.2d at 67; *supra* note 8 (explaining that Third Circuit law governs admissibility of expert opinion); *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (excluding expert report from consideration on summary judgment when the substance of the expert report was not sworn to by expert); *Sarmiento v. Montclair State Univ.*, 513 F. Supp. 2d 72, 83 n.6 (D.N.J. 2007) (same); *Rockwell Tech., LLC. v. Spectra-Physics Lasers, Inc.*, 2002 WL 523390 at *3 (D. Del. Apr. 8, 2002) (unpublished) (same). Nevertheless, although it would be proper here to hold CAT to the well-established requirements of Rule 56, I will treat Dr. Grimes's opinions as being part of the record, at least at this juncture.

998     functions of the device" anticipated the "general authorization code." (D.I. 123 at

999     24 with language added from U.S. Pat. No. 5,221,838 ("*Gutman*"); *see* D.I. 43,

1000    Ex. D, March 9, 1999 Office Action at SVS000190 (finding the general

1001    authorization code to be anticipated by *Gutman* at 7:59-8:18).)  CAT's reliance on

1002    the examiner's finding, however, is unpersuasive, since the examiner did not

1003    benefit from this Court's claim construction nor did he ever state that the password

1004    in *Gutman* could not also function as the clerk authorization code in a claim that

1005    does not include a general authorization code.[40]  Regardless of what the

1006    examiner's position may have been, though, CAT's argument that the checker ID

1007    could only be the general authorization code ignores the plain function of the

1008    checker ID, which is to permit a debit transaction to occur.  The checker ID is the

1009    code entered by a checker to "allow[] the terminal to accept electronic payments"

1010    (2:7), such as those detailed by the ATM Purchase and ATM Return transaction

1011    methods, which is the function of the OMNI 490 counter-top terminal.  Clearly,

1012    the checker ID does not initiate communication with a host data processor, as

1013    required of the general authorization code, but initiates the debit purchase

1014    transaction, as required of the clerk authorization code.

1015        Therefore, I agree with the opinion of SVS's expert Ms. Breitzke (D.I. 104,

1016    Ex. A, Breitzke Report at 40; D.I. 104, Ex. B, Breitzke Rebuttal Report at 2-6.)

---

[40] When faced with *Gutman*, the examiner did find the clerk authorization code to be allowable matter in the same office action, but only when accompanied by the additional step of entering a customer authorization code.  (D.I. 43, Ex. D, March 9, 1999 Office Action at SVS000193).

1017    that the checker ID is the clerk authorization code, and no reasonable jury could

1018    find otherwise unless it ignores the plain function of the checker ID.[41]

1019    • **electronically transmitting a transaction request to the host data processor**

1020    **through the telecommunications means of the counter-top terminal for**

1021    **requesting a response of approval or disapproval from the host data processor;**

1022    The Court has construed "requesting a response of approval or disapproval

1023    from the host data processor" to mean "requesting that the host data processor

1024    approve or disapprove a debit purchase transaction." (D.I. 61 at 25-26.) The

1025    Manual discloses that "[t]he transaction [using the OMNI 490] is routed through

1026    the MicroTrax controller via a telephone line connection to the host processor for

1027    approval," (2:14), the OMNI 490 "[g]enerates authorization requests, sends them

1028    to the EPS network via the store controller, and displays the host response," (2:1);

---

[41] In the ATM Return transaction, a "manager's ID must be entered" (2:31), which is a numeric code up to nine digits long (1:15) that is "used to ok [the] transaction[]" (1:15). As SVS points out, the manager's ID also functions as a clerk authorization code in the ATM Return method. (D.I. 103 at 7.) Claim 1 is open-ended; it states that the claimed method "comprises the steps of." Therefore, a method for processing debit purchase transactions, such the ATM Return method disclosed in the Manual, may include an additional step of entering a second "clerk authorization code." CAT argues that the manager's ID cannot be the clerk authorization code because an ATM Return transaction is not a debit purchase transaction within the meaning of the '859 patent's claims, because a clerk would not know the manager's ID, and because it is entered by a manager, which CAT believes is beyond the definition of clerk authorization code construed by the Court, i.e. "the *clerk* enters a series of numbers ... ." (D.I. 123 at 25-27.) However, as already discussed above, the ATM Return transaction described in the Manual is a "purchase transaction" within the meaning of the '859 patent's claims. *See supra* note 35. Moreover, there is no discernible prohibition in the Manual against a clerks' knowing the manager's ID, nor any instruction that a manger cannot act as a clerk during an ATM Return transaction. Therefore, CAT has not identified any genuine issue of material fact that the manager's ID cannot serve as the clerk authorization code.

1029      and the OMNI 490 communicates with the store controller over a local area

1030      network, LAN, (1:62-63, 4:1-2; 5:1-9.) The Manual discloses that those actions

1031      are done for both relevant methods disclosed. (2:18-19, 2:31.)

1032      • **receiving a response from the host computer; and**

1033      The Manual discloses that a response is received from the host computer in

1034      both relevant methods. (2:14 ("If the transaction is approved, a receipt is printed.

1035      If the transaction is declined, the checker device displays a reason for the

1036      denial."); 2:18-19 ("host sends back an" "Approved Message" or a "Declined

1037      message" after which "a receipt is generated on the printer" or "[t]he message

1038      contained in the Controller's Response Code Conversion File is displayed"); 2:31

1039      ("Approval/Decline is the same as in ATM card processing. APPROVED: The

1040      host sends back an "Approved" message. A receipt is generated on the printer. If

1041      NED [sic], the lane equipment displays a message described in the Controller's

1042      Response Code Conversion File.").)

1043      • **displaying the response from the host data processor for the debit purchase**

1044      **transaction on the counter-top terminal display**

1045      The Manual discloses that an "Approved" (2:18-19, 2:31) or "Declined"

1046      message (2:19, 2:31) is displayed.

1047      In light of the foregoing, I conclude that claim 1 is anticipated by both the ATM

1048 Purchase and ATM Return methods for processing debit purchase transactions described

1049 in the Manual.

1050      *Claim 2:*

1051      Dependent claim 2 includes all of the steps of independent claim 1, but adds two

1052 further steps which are also anticipated by the ATM Purchase method disclosed in the

1053 Manual:

1054      • **entering sales data by the clerk; and**

1055          The Manual discloses that "[t]he purchase amount and cashback amount, if

1056          any, are entered by the checker on the checker device located in the lane."  (2:14;

1057          *see also* 2:16-17.)

1058      • **entering confirmation of the sales data from the customer**

1059          The Manual discloses that "[t]he total is displayed to the customer for

1060          approval.  The customer PRESSES the key labeled [Yes] or the key labeled [No]."

1061          (2:17.)

1062      Therefore, claim 2 is anticipated by the ATM Purchase method for processing

1063 debit purchase transactions disclosed by the Manual.

1064      *Claim 3:*

1065      Dependent claim 3 includes all of the steps of independent claim 1, but adds one

1066 further step which is also anticipated by both the ATM Purchase and ATM Return

1067 methods disclosed in the Manual:

1068      • **printing a debit transaction receipt in response to a print command from the**

1069      **computer**

1070          The Manual discloses that "[i]f the transaction is approved, a receipt is

1071          printed."  (2:14, *see also* 2:18, 2:31.)

1072    Therefore, claim 2 is anticipated by the ATM Purchase and ATM Return methods

1073    for processing debit purchase transactions disclosed by the Manual.

1074        *Claim 5:*

1075        Dependent claim 5 includes all of the steps of independent claim 1, except that the

1076    "transaction request transmitting step" in claim 1 comprises five new steps, which are

1077    also anticipated by the ATM Return method disclosed in the Manual:

1078    • **requesting a credit increase for use with the debit card; receiving a credit**

1079        **amount from the customer; entering the credit amount into the computer using**

1080        **the keypad; transmitting credit amount data representative of the credit**

1081        **amount received to the host data processor; increasing the value of the debit**

1082        **card by the credit amount.**

1083        The Manual discloses a method for processing ATM Returns in which a

1084    "return amount" is received from a customer (2:30),[42] that amount is entered by a

1085    checker through a keypad (2:30), that return amount "information is sent to the

1086    controller" (2:31) which then approves or declines the credit to the ATM account

1087    (2:31).

1088        Therefore, claim 5 is anticipated by the ATM Return method for processing debit

1089    purchase transactions disclosed by the Manual.[43]

---

[42] CAT concedes that in the "dependent claim step of a credit transaction," the value of the debit card can be increased by "return of a product, void of a purchase, or otherwise adding value to the card." (D.I. 139 at 4.)

[43] For anticipation of this claim – and claims 16, 24, and 35 – SVS cites to the ATM return transaction method disclosed by the Manual which uses the Tranz 340 terminal unit instead of the OMNI 490. (D.I. 103 at 9-10, 14, 16, 19.) The ATM return

1090    *Claim 6:*

1091    Dependent claim 6 includes all of the steps of independent claim 1, except that the

1092    "card reading step" in claim 1 comprises a new step, which is also anticipated by the

1093    ATM Purchase and ATM Return methods disclosed in the Manual:

1094    • **swiping the card through the card reader**

1095        The Manual discloses that a customer's ATM card is read by the OMNI

1096        490 terminal "when a customer slides [it] ... through a card reader located at the

1097        right side of the terminal." (2:14; see also 2:15, 2:29.)

1098    Therefore, claim 6 is anticipated by the ATM Purchase and ATM Return methods

1099    for processing debit purchase transactions disclosed by the Manual.

1100    *Claim 7:*

1101    Dependent claim 7 includes all of the steps of independent claim 1, but adds an

1102    additional step and alters the "transaction data entering step" in claim 1 to "include" a

1103    new step. Both of those changes are anticipated by the ATM Purchase and ATM Return

1104    methods disclosed in the Manual:

1105    • **providing a remote keyboard communicating with the terminal unit, and**

1106        **wherein the transaction data entering step includes the step of entering data**

1107        **through the keyboard**

---

transaction method for the terminals is very similar (*Compare* 3:39-43 *with* 2:28-31; *see also* 3:1-19). While it appears that the ATM return method disclosed by the Manual which uses the Tranz 340 terminal unit also anticipates claims 5,16, 24, and 35, I do not address that point any further because I find those claims anticipated by the ATM Return Method, which uses the OMNI 490. My conclusions regarding anticipation are, thus, based on transactions methods which use the OMNI 490.

1108        The Manual discloses a remote "checker display" with a keyboard through

1109    which the checker enters transaction data. (2:16, 2:30.)

1110        Therefore, claim 7 is anticipated by the ATM Purchase and ATM Return methods

1111    for processing debit purchase transactions disclosed by the Manual.

1112        *Claim 8:*

1113        Dependent claim 8 includes all of the steps of dependent claim 7, but adds an

1114    additional requirement:

1115    • **wherein the remote keyboard comprises a hand-held styled keyboard**

1116        The Manual discloses a remote "checker device" with a keyboard through

1117    which the checker enters transaction action data. (2:16, 2:30.) The Manual,

1118    however, does not indicate that the "checker device" is handheld. SVS's expert

1119    asserts that the picture of the checker device indicates that it is handheld. (D.I.

1120    104, Ex. A at 94.) Although it does not appear that CAT has yet presented

1121    admissible expert opinion in rebuttal on that point, without the benefit of a clear

1122    and definite explanation by Ms. Breitzke why she believes the picture indicates

1123    that the checker device is handheld, a rational trier of fact could find the SVS has

1124    failed to carry its burden by a preponderance of the evidence.

1125        Therefore, whether claim 8 is anticipated because the Manual's discloses that the

1126    checker device is hand-held is a "genuine issue for trial."[44] *Cf. Matsushita*, 475 U.S. at

1127    587.

---

[44] For that reason, I will also deny CAT's motion for summary judgment of validity of claim 8.

1128      *Claim 9:*

1129         Dependent claim 9 includes all of the steps of dependent claim 1, but requires the

1130 host data processor to be a particular type of processor, one of which is anticipated by the

1131 ATM Purchase and ATM Return methods disclosed in the Manual:

1132    •   **wherein the host data processor includes one of a credit authorization provider,**

1133       **a phone card provider, and a telephone switch**

1134         Neither SVS nor CAT offers a clear interpretation of the limitations added

1135      by this claim. The language "one of" supports interpreting the claim as requiring

1136      that the host data processor be any one of the three types listed – that is, it could be

1137      a host data processor for a credit authorization provider, *or* a phone card provider,

1138      *or* a telephone switch. Alternatively, the use of the word "and" supports

1139      interpreting the claim as requiring that the host data processor be all three of the

1140      types listed – that is, it must be a host data processor for a credit authorization

1141      provider, *and* a phone card provider, *and* a telephone switch. SVS implicitly

1142      argues that it is the former, asserting that the Manual anticipates claim 9 by

1143      disclosing a method in which the host data processor is a credit authorization

1144      provider. (D.I. 103 at 12.) SVS's expert agrees with that reading of the claim.

1145      (D.I. 104, Ex. A, Breitze Report at 19.) Apparently, the PTO does as well. (D.I.

1146      165, May 12, 2011 Non-Final Office Action at 6 ("The 'phone card provider' and

1147      'telephone switch' are optionally recited and carry no patentable weight."). CAT

1148      does little to oppose that reading, simply stating in a conclusory manner that it

1149      disputes SVS's contention that claim 9 is anticipated. (D.I. 123 at 5.)

1150    Although the claim is not easily deciphered, I believe SVS and the PTO

1151    have identified the better reading. To interpret the claim otherwise would

1152    effectively write "one of" out of the claim, something I am unwilling to do. Thus,

1153    I interpret claim 9 as listing three independent specific types of host data

1154    processors, any one of which may be the "host data processor" as used in claim

1155    1.[45]

1156    The Court has previously construed "credit authorization provider" as "a

1157    service provider that maintains the value associated with a debit styled card."

1158    (D.I. 61 at 26.) The Manual discloses a method that "electronically processes the

1159    payment of goods at the point-of-sale" (Manual at 2:14) which includes a request

1160    for the host data processor to decrease (2:15-2:19) or increase (2:28-2:31) the

1161    value of the account associated with an ATM card. (2:14).

1162    Therefore, claim 9 is anticipated by both the ATM Purchase and ATM Return

1163    methods disclosed in the Manual, which utilize a host data processor of a credit

1164    authorization provider for processing debit purchase transactions.

---

[45] I recognize that an argument could be made that my interpretation renders claim 9 largely redundant in light of claim 1, which would appear to encompass any kind of host data processor. Nonetheless, to interpret the language "one of" to actually mean "all three of" would put more weight on the word "and" then it can bear, and I must interpret the claims as they are written.

*Claim 10:*

Independent claim 10 is substantially similar to independent claim 1, differing in only the following minor ways, which are also anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **a keypad for data entry to the computer, an alphanumeric display responsive to the computer**

    The word "a" when used in a claim that is written in open form indicated by the term of art "comprising," such as claim 10, means "one or more." *Baldwin Graphic Systems, Inc., v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008). The Manual discloses that the OMNI 490 has one or more keypads for data entry (1:75, 2:3-6; 2:14, 2:16) and an alphanumeric display responsive to the computer (2:17-19, 2:30-31).

- **a card reader communicating with the computer**

    The Manual discloses that the OMNI 490 has a card reader for communicating with the computer (2:15, 2:18, 2:29).

- **reading a debit styled card through the card reader for transferring card data to the computer**

    The Court has construed "debit styled card" to include ATM cards. (D.I. 61 at 10-15.) In both relevant debit purchase transaction methods disclosed by the Manual, an ATM card is read through the card reader for providing card data to the computer. (2:1, 2:14, 2:15, 2:29.)

1186     • **communicating with a host data processor through the telecommunications**

1187       **means of the counter-top terminal for requesting authorization of the debit**

1188       **purchase transaction, requesting authorization of the debit purchase**

1189       **transaction from the host data processor;**

1190          The Manual discloses that "[t]he transaction [using the OMNI 490] is

1191       routed through the MicroTrax controller via a telephone line connection to the host

1192       processor for approval," (2:14); the OMNI 490 "[g]enerates authorization

1193       requests, sends them to the EPS network via the store controller, and displays the

1194       host response," (2:1); and the OMNI 490 communicates with the store controller

1195       over a local area network, LAN, (1:62-63, 4:1-2; 5:1-9).  The Manual discloses

1196       that those actions are done for both relevant methods disclosed.  (2:18-19, 2:31.)

1197     • **and receiving the authorization**

1198          The Manual disclose that a response is received from the host computer in

1199       both relevant methods.  (2:14 ("If the transaction is approved, a receipt is printed.

1200       If the transaction is declined, the checker device displays a reason for the

1201       denial."); 2:18-19 ("host sends back an" "Approved Message" or a "Declined

1202       message" after which "a receipt is generated on the printer" or "[t]he message

1203       contained in the Controller's Response Code Conversion File is displayed"); 2:31

1204       ("Approval/Decline is the same as in ATM card processing.  APPROVED: The

1205       host sends back an "Approved" message.  A receipt is generated on the printer. If

1206       NED [sic], the lane equipment displays a message described in the Controller's

1207       Response Code Conversion File.").)

1208      Therefore, claim 10 is anticipated by both the ATM Purchase and ATM Return

1209   methods for processing debit purchase transactions described in the Manual.

1210      *Claim 11:*

1211      Dependent claim 11 includes all of the steps of independent claim 10, but adds one

1212   further step which is also anticipated by the ATM Purchase and ATM Return methods

1213   disclosed in the Manual:

1214     •   **modifying a purchasing value of the card in response to card use**

1215        The Court has defined "purchasing value of a card in response to card use"

1216        as "a value stored on a card itself or a value in an account associated with a card

1217        (but not limited to situations where the card holder has a business arrangement

1218        with the host data processor." The Manual discloses a method in which the

1219        counter-top terminal is used to modify the value of the account associated with an

1220        ATM card by decreasing such value (2:15-2:19) or increasing such value (2:28-

1221        2:31) after "a customer slides an ATM card." (2:14, 2:29).

1222      Therefore, claim 11 is anticipated by the ATM Purchase and ATM Return

1223   methods for processing debit purchase transactions disclosed by the Manual.

1224      *Claim 12:*

1225      Dependent claim 12 includes all of the steps of independent claim 10, but adds one

1226   further step which is also anticipated by the ATM Purchase and ATM Return methods

1227   disclosed in the Manual:

1228     •   **displaying the response from the host data processor for the debit purchase**

1229        **transaction on the counter-top terminal display**

1230          The Manual discloses that an "Approved" (2:18-19, 2:31) or "Declined"

1231      message (2:19, 2:31) is displayed.

1232          Therefore, claim 12 is anticipated by the ATM Purchase and ATM Return

1233      methods for processing debit purchase transactions disclosed by the Manual.

1234          *Claim 13:*

1235          Dependent claim 13 includes all of the steps of independent claim 10, but adds

1236      two further steps which are also anticipated by the ATM Purchase method disclosed in

1237      the Manual:

1238      • **entering sales data by the clerk; and**

1239          The Manual discloses that "[t]he purchase amount and cashback amount, if

1240      any, are entered by the checker on the checker device located in the lane." (2:14;

1241      *see also* 2:16-17.)

1242      • **entering confirmation of the sales data by the customer**

1243          The Manual discloses that "[t]he total is displayed to the customer for

1244      approval. The customer PRESSES the key labeled [Yes] or the key labeled [No]."

1245      (2:17).

1246          Therefore, claim 13 is anticipated by the ATM Purchase method for processing

1247      debit purchase transactions disclosed by the Manual.

1248         *Claim 14:*

1249         Dependent claim 14 includes all of the steps of independent claim 10, but adds one

1250 further step which is also anticipated by the ATM Purchase and ATM Return methods

1251 disclosed in the Manual:

1252    • **printing a debit transaction receipt in response to a print command from the**

1253     **computer**

1254         The Manual discloses that "[i]f the transaction is approved, a receipt is

1255     printed." (2:14, *see also* 2:18, 2:31.)

1256         Therefore, claim 14 is anticipated by the ATM Purchase and ATM Return

1257 methods for processing debit purchase transactions disclosed by the Manual.

1258         *Claim 16:*

1259         Dependent claim 16 includes all of the steps of independent claim 10, except that

1260 the "transaction request transmitting step" in claim 1 comprises three new steps, which

1261 are also anticipated by the ATM Return method disclosed in the Manual:

1262    • **entering a credit amount into the computer using the keypad; transmitting the**

1263     **credit amount received to the host data processor; and increasing the value of**

1264     **the debit card by the credit amount**

1265         The Manual discloses a method for processing ATM Returns in which a

1266     "return amount" is received from a customer (2:30), that amount is entered by a

1267     checker through a keypad (2:30), that return amount "information is sent to the

1268     controller" (2:31) which then approves or declines the credit to the ATM account

1269     (2:31).

69

1270     Therefore, claim 16 is anticipated by the ATM Return method for processing debit

1271     purchase transactions disclosed by the Manual.

1272         *Claim 17:*

1273     Dependent claim 17 includes all of the steps of independent claim 10, except that

1274     the "card reading step" in claim 10 comprises a new step, which is also anticipated by the

1275     ATM Purchase and ATM Return methods disclosed in the Manual:

1276     • **swiping the card through the card reader**

1277         The Manual discloses that a customer's ATM card is read by the OMNI

1278         490 terminal "when a customer slides [it] … through a card reader located at the

1279         right side of the terminal." (2:14; *see also* 2:15, 2:29.)

1280     Therefore, claim 17 is anticipated by the ATM Purchase and ATM Return

1281     methods for processing debit purchase transactions disclosed by the Manual.

1282         *Claim 18:*

1283     Dependent claim 18 includes all of the steps of independent claim 10, but adds an

1284     additional step and alters the "transaction data entering step" in claim 10 to "include" a

1285     new step, changes which are anticipated by both the ATM Purchase and ATM Return

1286     methods disclosed in the Manual:

1287     • **providing a remote keyboard communicating with the terminal unit, and**

1288       **wherein the transaction data entering step includes the step of entering data**

1289       **through the keyboard**

1290         The Manual discloses a remote "checker display" with a keyboard through

1291         which the checker enters transaction action data. (2:16, 2:30.)

70

1292    Therefore, claim 18 is anticipated by the ATM Purchase and ATM Return

1293    methods for processing debit purchase transactions disclosed by the Manual.

1294        *Claim 19:*

1295    Dependent claim 19 includes all of the steps of dependent claim 10, but requires

1296    the host data processor to be a particular type of processor, one of which is anticipated by

1297    the ATM Purchase and ATM Return methods disclosed in the Manual:

1298    • **Wherein the host data processor includes one of a credit authorization**

1299        **provider, a phone card provider, and a telephone switch.**

1300        As explained above in regard to identical language in claim 9, the language

1301        in claim 19 refers to three independent specific types of host data processors, any

1302        one of which may be the "host data processor" as used in claim 1.

1303        The Court has previously construed "credit authorization provider" as "a

1304        service provider that maintains the value associated with a debit styled card."

1305        (D.I. 61 at 26.) The Manual discloses a method that "electronically processes the

1306        payment of goods at the point-of-sale" (Manual at 2:14) which includes a request

1307        for the host data processor to decrease (2:15-2:19) or increase (2:28-2:31) the

1308        value of the account associated with an ATM card. (2:14).

1309    Therefore, claim 19 is anticipated by both the ATM Purchase and ATM Return

1310    methods disclosed in the Manual, which utilize a host data processor of a credit

1311    authorization provider for processing debit purchase transactions.

1312    *E.    Obviousness*

1313    SVS asserts that claims 4, 15, 23, and 34 are invalid as obvious under 35 U.S.C.

1314    § 103 because the Manual in combination with U.S. Patent No. 5,732,136 (the " '136

1315    patent") teaches every limitation of those claims.  I do not address SVS's contentions

1316    with regard to claims 23 and 34, as I have already held those claims to be invalid for

1317    failing to satisfy the written description requirement of 35 U.S.C. § 112 ¶ 1.

1318    Turning to claims 4 and 15,[46] SVS admits that those claims require the steps of

1319    "receiving encrypted approval data from the host data processor" and "decrypting the

1320    encrypted approval data." (D.I. 103 at 20, 22; '859 patent at 8:23-25, 9:32-35).  SVS

---

[46] Claims 4 and 15 read in full as follows:

> 4. The method according to claim 1, wherein the transaction request transmitting step comprises the step of:
> transmitting an activation request for a phone card;
> processing a data record for the phone card;
> creating a message authorization code;
> encrypting phone card data for transmitting to the counter-top terminal;
> transmitting the encrypted phone card data to the host data processor;
> receiving encrypted approval data from the host data processor;
> decrypting the encrypted approval data on the computer for the response displaying step.

> 15. The method according to claim 10, wherein the transaction request transmitting step comprises the step of:
> requesting a phone card;
> processing a data record for the phone card;
> creating a message authorization code;
> encrypting phone card data for transmitting from the counter-top terminal;
> transmitting the encrypted phone card data to the host data processor;
> receiving encrypted approval data from the host data processor;
> decrypting the encrypted approval data on the computer for the response displaying step.

further admits that those steps are not directly disclosed in either the Manual or the '136 patent. (D.I. 103 at 21-22.) SVS contends, however, that "it would have been obvious to one of ordinary skill in the art in 1996 to include those steps," because, as also stated by SVS's expert, "it would have been obvious to one of ordinary skill in the art to increase security by utilizing encryption and decryption for the validation or approval message sent from a host data processor." (D.I. 103 at 21; *see* D.I. 104, Ex. A, Breitzke Report at 138.)

Ms. Breitzke indicates that there was a motivation to combine the teachings of the Manual with the '136 patent "to provide electronic processing of all types of transactions at the point-of-sale" by "provid[ing] a method for the secure activation and use of phone cards" in order to "bring added revenues and … attract additional consumers who purchase other items at the same time." (D.I. 104, Ex. A, Breitzke Report at 197.) Viewed in the light most favorable to CAT, however, the report and opinions of Ms. Breitzke do not persuade me that there is no issue of material fact as to whether one of ordinary skill would feel motivated to "increase security" by encrypting approval data sent from a host processor to a computer, a step not disclosed in the '136 patent but required by the '859 patent.

Therefore, I will deny SVS's motion for summary judgment with respect to obviousness for claims 4 and 15.[47]

---

[47] I do not address all the *Graham* factors, for regardless of an analysis of those factors, SVS's motion for summary judgment fails on the grounds stated.

## V. Conclusion

For the reasons stated, I will deny CAT's Motion for Summary Judgment of Validity (D.I. 109) and CAT's Motion to Exclude the Expert Testimony of Lori Breitzke (D.I. 107), grant in part and deny in part SVS's Motion for Summary Judgment of Invalidity Due to Anticipation and Obviousness (D.I. 102), and grant SVS's Motion for Partial Summary Judgment of Invalidity of Claims 20, 22-31, and 33-38 Due to Lack of Written Description (D.I. 167). An appropriate order will follow.